**WERBUNGS UND COMMERZ UNION AUSTALT, Plaintiff,**

v.

**COLLECTORS GUILD, LTD., Defendant.**

**No. 84 Civ. 7393 (CHT).**

United States District Court, S.D. New York.

Dec. 19, 1989.

Cinque & Cinque, P.C., New York City (Robert W. Cinque, James P. Cinque, of counsel), for plaintiff.

Ostrolenk, Faber, Gerb & Soffen, New York City (Robert C. Faber, of counsel), for defendant.

TENNEY, District Judge.

This case is before the court on several motions arising out of a trial which concluded in a jury verdict and award of damages in favor of plaintiff in the amount of $1,140,000. Defendant has renewed its motion for a directed verdict, which it made at the close of plaintiff's case, and has moved to set aside the verdict and for a new trial on several grounds. For the reasons set forth below, defendant's motions are denied, except to the extent that they seek a new trial based on the size of the damage award. That motion will be granted in fifteen days unless plaintiff agrees to a remittitur in the amount of $422,085.

## BACKGROUND

In 1968, plaintiff commissioned the artist Salvador Dali to produce thirteen water-color illustrations inspired by the book "Alice in Wonderland." Plaintiff also acquired the right to reproduce the illustrations. Plaintiff and Maecenas Press, Ltd., a predecessor in interest of defendant, agreed to produce two editions of books containing a specific number of lithographic reproductions of these original water colors.

This agreement between plaintiff and Maecenas was expressed in two separate agreements executed on January 29, 1969. In the first, plaintiff and Maecenas agreed to share the rights and income of the venture jointly. In the second, plaintiff sold to Maecenas all its rights, title and interest in "the two editions" and "all earnings therefrom" in return for $60,000. Plaintiff retained the thirteen original water colors.

Fifteen years later, defendant Collectors' Guild acquired Maecenas' rights under these agreements. It commissioned new lithographic reproductions of the images in the two books and marketed them through such entities as the American Express and Diner's Club credit card companies. Collectors' Guild sold millions of dollars worth of these reproductions, although they claimed at trial that they experienced a net loss on the venture.

Plaintiff eventually instituted this action, claiming that under the first of the two January 1969 agreements, it retained the right to a one-half share in the profits of the sale of these lithographs. Defendant asserted that plaintiff had given up that right, pointing to the second agreement in which plaintiff relinquished all its rights, title and interest in the "two editions." Defendant has consistently argued throughout the course of the litigation that through this language, plaintiff gave up not only the rights to share in the profits of the sale of the books, but also any profits realized from derivative use of the images contained therein.

By an opinion dated December 22, 1987, Judge Pierre Leval, of this court, ruled that plaintiff and defendant were joint holders of a copyright interest in the subsequent reproductions. *Werbungs und Commerz Union Austalt v. LeShufy, et al.,* 84 Civ. 7393 (PNL), slip op. at 5, 1987 WL 33618 (S.D.N.Y. Dec. 22, 1987). He held that the complaint stated a valid cause of action for breach of contract but dismissed plaintiff's copyright claims. *Id.* at 4. He subsequently held that the words "the two editions" in the second agreement were sufficiently ambiguous to survive a motion for summary judgment, *Werbungs und Commerz Union Austalt v. Collectors' Guild, Ltd.,* 84 Civ. 7393 (PNL), slip op. at 4 (S.D.N.Y. July 12, 1988), and the issue was eventually submitted to the jury at trial.

Through special interrogatories, the jury found that plaintiff had not relinquished its rights to share in the profits of the subsequent reproductions, and returned a verdict in its favor, along with damages amounting to $1,140,000. These motions followed and the court has stayed entry of judgment pending their resolution.

## DISCUSSION

A. *Liability*

■ Defendant's first ground for overturning the jury's verdict arises from its argument that it was error to submit the contractual interpretation issue to the jury. It reasserts that it should have been granted summary judgment prior to trial on the contract claim. That aspect of defendant's

motion is denied because the submission of the issue to the jury was proper. If anything, Judge Leval might very well have been justified in granting summary judgment on this issue in favor of plaintiff.

The submission of this issue to the jury is well-supported by New York law and the law of this circuit. As defendant notes, it is, as a general matter, the province of a court to construe the meaning of the terms of a contract. *See, e.g., Hunt, Ltd. v. Lifshultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989); *Chimart Assoc. v. Paul,* 66 N.Y.2d 570, 572–73, 489 N.E.2d 231, 233, 498 N.Y.S.2d 344, 346 (1986). Nevertheless, when the court finds the terms of the contract sufficiently ambiguous, it may submit its interpretation to a jury. *Proteus Books, Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502, 509 (2d Cir.1989); *Meyers v. The Selznick Co.,* 373 F.2d 218, 222 (2d Cir.1966); *Citizens Central Bank v. Fisher,* 126 A.D.2d 968, 969, 511 N.Y. S.2d 743, 743 (4th Dep't 1987); *Carvel Corp. v. Rait,* 117 A.D.2d 485, 488, 503 N.Y.S.2d 406, 409 (2d Dep't 1986); *see State v. Home Indemnity Co.,* 66 N.Y.2d 669, 671, 486 N.E.2d 827, 829, 495 N.Y.S.2d 969, 971 (1985). As Judge Leval found, the terms of the contract were ambiguous and susceptible to differing interpretations. Therefore, even if the decision to submit the issue to the jury had been incorrect, the remedy would not be a new trial, but would be for the court to determine the issue as a matter of law based on the extrinsic evidence adduced at trial.

The critical question was whether plaintiff sold to Maecenas the limited right to share in the profits of the marketing of the two books, or whether it surrendered all rights it may have had to derivative use of the illustrations in them as well. Throughout the trial, and in its post-trial motions, defendant has repeatedly emphasized the parties' use of the phrase "all rights, title and interest," arguing that the intent to transfer everything possible was unmistakable. That argument misses the point, however, because the question is not the scope of the rights transferred, for clearly, whatever rights plaintiff transferred were without reservation. The real question is:

All rights, title and interest in what? To answer it, the jury had to resolve what the parties meant by the words "the two editions."

The parties were deeply divided at trial over the meaning of that phrase. Plaintiff asserted that it meant only the actual books themselves. This seems consistent with the parties' intent at the time the agreements were drafted, since they do not mention any other use of the books, and limit the publication of future editions. Plaintiff's position is supported by case law as well. Despite J. Robert LeShufy's testimony to the contrary, the evidence developed at trial tended to confirm what the language of the document itself suggested: namely, that at the time they entered into the two agreements, the parties did not contemplate derivative use of the books' illustrations—such as the marketing of the poster-sized reproductions at issue here.

The words "the two editions" were not sufficiently clear or broad enough to justify putting the burden on plaintiff to prove that it did not intend to transfer the derivative rights. *See Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150, 155 (2d Cir.), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.10[B] at 10–85 to 10–87 (1989) (*"Nimmer"*). Similarly, it was not necessary for Maecenas to have acquired the right to market such reproductions to permit it full enjoyment of the rights specifically granted in the agreements, publication of the books themselves. *See United Artists Television, Inc. v. Fortnightly Corp.,* 377 F.2d 872, 882–83 (2d Cir.1967), *rev'd on other grounds,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968); *Nimmer* § 10.10[C] at 10–88.1 to 10–89. Therefore, it became defendant's burden to prove that plaintiff intended to transfer the derivative rights of reproduction, which defendant failed to do. Accordingly, had the jury not returned a finding in favor of plaintiff on this issue, the court might well have construed the contract as a matter of law and directed a verdict on liability in favor of plaintiff. The jury's finding that plaintiff

effectuated only a partial transfer of its rights in the books and its illustrations is fully supported by the law in this circuit. *See Goodis v. United Artists Television,* 425 F.2d 397, 403 (2d Cir.1970).

## B. *Damages*

By far the more significant aspect of defendant's motions is its claim that the jury's damage award was excessive. Related to this claim is defendant's argument that the court improperly submitted an issue concerning the discovery process to the jury. Each of these points will be discussed in turn.

### 1. Motion for Judgment Notwithstanding the Verdict

At the outset, the court notes that there is no legal basis to disturb the jury's verdict. In *Mattivi v. South African Marine Corp. ("Huguenot"),* 618 F.2d 163, 167–68 (2d Cir.1980), the court of appeals for this circuit observed:

> [W]hen deciding whether to grant a judgment n.o.v., the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it].

Defendant introduced extensive testimony through which it sought to prove that, instead of realizing a profit from the sale of the Dali lithographs, it actually experienced a loss. The relevant testimony was that provided by Max Munn, the president of Collectors' Guild, and Dr. Jonathan A. Cunitz, who had served as a financial consultant to Collectors' Guild for a period of time with direct involvement in the Dali project. Dr. Cunitz testified both in his capacity as an expert in marketing and as a fact witness. There is no need to dwell on the testimony in support of defendant's position that it experienced an overall loss, since the jury's award of over one million dollars in damages necessarily means that it rejected that testimony.

The general nature of the jury's damage award causes any effort to determine how it arrived at a figure of $1,140,000 to be based, in part, on assumptions. As noted above, however, certainty is not required; the court need only find that there was sufficient evidence in the record to rule out the conclusion that the award was based on sheer surmise or conjecture. *Mattivi,* 618 F.2d at 167–68. The preciseness of the award does provide some help in discerning the basis for the jury's award, however.

In his summation, counsel for plaintiff plausibly argued that defendants had sold 14,000 to 15,000 images, relying on evidence that was in the record. He argued to the jury that LeShufy, the person who had commissioned the lithographic reproductions of the images in the book, had delivered between 14,000 and 15,000 individual lithographs to defendant. He then noted a letter published by Collector's Guild in April 1987, in which Munn advised the public that there were no more than 200 of each image left. Since there were thirteen different images, he asked the jury to subtract approximately 2500 (approximately 200 × 13) from 15,000 leaving 12,500, which counsel argued was the amount sold.

Defendant presented testimony that it actually had thousands of lithographs still in its inventory. *See* Defendant's Motion for Judgment Notwithstanding the Verdict at 17. It also presented testimony that some prints had been damaged, stolen or returned by buyers. The jury was free to reject some or all of that testimony, as it apparently did.

The jury was instructed that it should base its award on the agreements, which, they were also instructed, provided only for a one-half share in the profits. Therefore, doubling the $1,140,000 damage award, it

appears the jury found that defendant realized a profit of $2,280,000 from the lithograph sales. Defendant had presented evidence that its cost in acquiring each lithograph from LeShufy was $190. In its post-trial submissions, it notes that $2,280,000 is evenly divisible by $190. In fact, $2,280,000 divided by $190 is 12,000, a conspicuously precise figure, which is remarkably close to that urged on the jury by plaintiff. Noting this similarity, defendant argues that the jury must have erroneously used defendant's cost figures in determining profits.

The court agrees that the jury probably relied on the $190 figure, but disagrees that, if it did so, such action was improper. To the contrary, that approach seems most reasonable in light of the disparity of the claims each side made concerning the profits realized by Collectors' Guild. Plaintiff argued to the jury that defendant's profits on sales of 12,500 must have been roughly $7,000,000, or $560 profit per lithograph. He asked the jury to award half that amount, or $3,500,000. As noted above, defendant asserted that the whole venture resulted in a loss, arguing that plaintiff should not be entitled to any recovery at all. These extreme positions on profit were absolutely irreconcilable, so the jury apparently relied on costs as the appropriate starting point.

That costs and profit are related to one another is a fact so well known that even a lay jury could reasonably be expected to take note of, and apply, that relationship in determining a likely profit. Having presided over the selection of this jury, the court is in a position to note that it was even more qualified to assess the financial data presented to it. Several members had extensive educational backgrounds and others were experienced in dealing with financial matters. Therefore, the court is very skeptical that, if the jury used the cost figures to calculate its award, it did so in error, as defendant asserts. Moreover, defendant presented testimony about additional costs, besides the mere acquisition price. Therefore, a profit of $190 would have to have been less than fifty percent of the average sales price, a very reasonable

profit margin that lends credence to the jury's apparent approach. Accordingly, there is no basis for the court to disturb the jury's findings as a matter of law.

## 2. Motion for a New Trial

■ Unlike the standards governing judgments notwithstanding the verdict, the discretion afforded on decisions to require a remittitur or grant a new trial is very broad. The guiding principle is that courts try to ensure "that substantial justice is done on the facts of the individual case." 6A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 59.05[5] at 59–47. By definition, the opportunity to exercise discretion arises only when there is no legal basis for setting aside a verdict.

> A Federal District Judge not only has the power and authority but is charged with the duty and responsibility to set aside the verdict of a jury and to grant a new trial when in his judgment and discretion the amount of compensation awarded is excessive. The granting of a new trial is discretionary with the court and subject to no fixed rule except a consideration of what is just.

*Id.* ¶ 59.05[5] at 59–52 to 59–53 (1989) (quoting *Murphy v. United States District Court*, 145 F.2d 1018, 1020 (9th Cir.1944), *cert. denied*, 325 U.S. 891, 65 S.Ct. 1090, 89 L.Ed. 2003 (1945)). Despite the fact that there is sufficient evidence in the record to support the jury's damage award, after considering the facts adduced at trial and the post-trial submissions, the court is convinced that justice requires some reduction in its size.

Although the jury's award was supported by the evidence, the court suspects that had additional evidence concerning defendant's inventory of unsold lithographs been admitted in evidence, the jury might well have returned a smaller award. The court precluded a fair amount of this evidence to rectify an advantage defendant achieved through misconduct during the discovery process. Although the preclusion rulings were proper, the court believes the penalty defendant paid for its miscon-

duct is too high for the court, in good conscience, to allow to stand.

The preclusion rulings during the trial stemmed from defendant's attempts to keep plaintiff from obtaining discoverable sales and inventory data. On June 6, 1986, plaintiff propounded on defendant a discovery request pursuant to Federal Rule of Civil Procedure 34, which requested, in pertinent part:

12. Each document which reflects revenue derived by any of the defendants from the commercial exploitation of sale of any reproductions of the "Water Colors" referred to in paragraph 10 of the complaint for the perod [sic] May 15, 1968 to the present. In this regard, should any of the defendants be possessed of summary tabulations, computer printouts or runs maintained on a weekly, monthly, quarterly or other periodic basis, such summaries will be acceptable in the first instance.

\*    \*    \*    \*    \*    \*

22. Each document which refers, relates to or concerns the location or situs of any unsold lithographs or other reproductions of the "Water Colors" which are in the possession, custody or control of any of the defendants.

Pl. Exh. 19.

On October 6, 1987, after several interventions by the court, defendant finally responded to these requests. The initial segment of the response raised a number of general objections not relevant to this discussion. The remainder consisted of responses to the specific requests, stating, in pertinent part:

12. The aforesaid general objections are repeated. No such document exists. However, with respect to original lithographs derived from illustrations in defendants' copyrighted editions, revenues have been derived only by Collectors Guild Ltd., Robert LeShufy and The Nelson Rockefeller Collection, Inc. A financial analysis of Collectors Guild Ltd. which shows the payments received by Collectors Guild Ltd. and the amounts paid to Robert LeShufy and Nelson Rockefeller Collection Inc. is available.

However, this is confidential business information. . . . Exposure of this valuable private business information to competitors might damage defendants' competitive positions or enable competitors to damage defendants through knowing how to compete with Collectors Guild Ltd. Accordingly, such confidential business information is being withheld.

\*    \*    \*    \*    \*    \*

22. The aforesaid general objections are repeated. No such document exists. However, with respect to original lithographs derived from illustrations in defendants' copyrighted editions, there is a document of Collectors Guild Ltd. concerning their inventories of lithographics [sic]. Said document is a confidential business record and the objection made as to No. 12 above is reasserted.

Def. Exh. F. Apparently, plaintiff did not object to these responses and made no effort to address the confidentiality objection with appropriate protective orders.

Under the Local Rules for the Southern District of New York, the definition of "document" includes "data compilations from which information can be obtained, if necessary, by the respondent through detection devices into reasonably usable form. . . ." Southern District of New York Local Rule 47(c)(2) (incorporating usage in Fed.R.Civ.P. 34(a)). Nevertheless, defendant stated that no responsive documents existed. On December 14, 1988, counsel for plaintiff deposed Max Munn, the President of Collectors' Guild. During the deposition, counsel for plaintiff attempted to explore the sales and inventory issue in the following line of questioning:

Q. How many [lithographs] have been sold in total during the period you have described?

A. I will research that and let you know. I don't have that number in memory.

Q. This is through direct sales by Collectors Guild?

A. Correct.

Q. What types of records does Collectors Guild maintain that would reflect sales of these reproductions?

A. General sales records.

Q. By what?

A. By stock number.

Q. Would it be in a book, would it be in some kind of journal edit or such; is it on a computer run?

A. I believe the information is available[,] although some of it may be outdated and purged[,] is available on computer records. Except we do update our records every six months and supress [sic] old information in the general course of doing business.

Q. Are you telling me that it is quite conceivable that Collectors Guild could not tell us how many in total of these lithographs have been sold from 1985 to the present or are you telling me that original data might not be available but source data is available of a more current nature?

A. I believe I am telling you that we update our computer files because of limited memory of six months and purge information that's older than six months and the sales files are not maintained for more than any six-month period.

Q. Are these records destroyed?

A. They are erased from the memory on the computer.

Q. Do they exist in any other form, the sales data?

A. If someone happens to have an outdated copy of a printout of that memory, we would have it, but we don't keep outdated sales information. There is just no business purpose for it.

Deposition of Max Munn, sworn to September 14, 1988, at 20–21 (Pl. Exh. 25). It is quite apparent that, through his incomplete answers, Munn intended to mislead counsel for plaintiff into believing that the information he sought no longer existed, a fact that was flatly contradicted by defendant's attempt to introduce computer printouts containing inventory data at the end of the trial.

■ Defendant now claims that the routinely-erased data referenced in the deposition consisted only of information such as customers' names. It claims Munn never actually stated that inventory data was erased. Admittedly, by a more thorough exploration of each of Munn's responses, counsel for plaintiff could probably have straightened out his misunderstanding of what data had, and had not, been retained in Collectors' Guild's computer. This does not mean that defendant should be able to escape the consequences of its action, however. The imposition of sanctions arising from abuse of the discovery process has broader purposes than the simple correction of wrongs committed in an individual case. *Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir.1979). Severe sanctions remind other members of the bar that misconduct during the discovery process, by attorneys or clients, may result in rulings that will compromise the presentation of a case at trial. *Id.* at 1068.

Plaintiff represented to the court that, prior to trial, he never received a single document in response to his discovery requests and defendant did not dispute this representation. Transcript ("Tr.") at 199. Nevertheless, despite the above testimony by Max Munn, and the foregoing responses to plaintiff's discovery requests, in which it claimed that no such documents existed, defendant arrived on the day of trial with one exhibit list, and offered two supplementary lists as the trial progressed, describing computer printouts, auditor's reports, memoranda, letters, agreements, and other documents relevant to the issues of costs, sales and inventory of the lithographs.

In an affidavit filed before trial, at the court's direction, Munn attempted to explain Collector's Guild's dilatory production of these documents. He began by noting that plaintiff's request requested "revenue" information, explaining:

5. Revenues refers [sic] to money received, not to money paid out, *and does not refer either to gross income, costs or net income, in my opinion.* Consequently, in my opinion, Defendant was never asked to supply information con-

cerning the costs about which Plaintiff now proposes to present testimony.

\* \* \* \* \* \*

9. Information concerning the sales and costs associated with the sales of the lithographic reproductions ... was provided to us through a program that was developed for us by Dr. Jonathan Cunitz.... [I]t includes compilations of voluminous original documents of Collectors' Guild Ltd., including information derived from invoices sent out, invoices received, payments made to and by Collectors' Guild, and the like.

10. The particular profitability program was in use during the time that Dr. Jonathan Cunitz was a consultant for us....

11. With Dr. Cunitz not working with us since 1985, and considering the potentially high volume of underlying materials that might have been needed, and considering that plaintiff had not pursued any Request to obtain information about Defendant's costs, and considering their not having sought Defendant's underlying data through Document Requests, *we were not aware of any need* to find anyone at Collectors' Guild Ltd. who could perhaps locate this information....

Affidavit of Max Munn, sworn to October 4, 1989 (emphasis added). Needless to say, this feeble excuse was never provided to plaintiff during the discovery process to explain defendant's failure to produce responsive material.

██ Even if it had been, the court could not accept defendant's arguments. Although a party is required to respond only to the requests and questions actually propounded during discovery, they should not be read hypertechnically; rather, a party should attempt to comply with discovery demands in good faith. *Cine Forty–Second Street Theatre Corp.*, 602 F.2d at 1068. Defendant's attempt to exclude cost information from a request clearly seeking data related to profits, smacks of the type of gamesmanship that the Federal Rules were designed to avoid. In addition, the fact that a party unilaterally decided that it just wasn't worth the effort to comply with an outstanding request is, in short, an explanation that may be rejected with no further discussion.

Defendant's implicit argument that it acted in good faith is belied by the conspicuous absence of any of these documents from the joint pretrial order. They were certainly material to its defense, and there would have been little justification for omitting the documents, except to further the scheme to keep plaintiff from discovering them. Had it listed the documents in the pretrial order, defendant would have mitigated the prejudice caused by its prior failure to disclose. It did not, however, possibly hoping that if plaintiff never learned of the documents, the defense might not necessarily have to introduce them as part of its case. Defendant adopted that strategy at its peril. The fact that it backfired is no reason to provide any relief.

As noted above, the information on Collectors' Guild's computer fell within the scope of plaintiff's discovery request and should have been produced. Even if defendant believed it did not include raw data in the computer, defendant had a continuing obligation to turn over any hard printouts. Fed.R.Civ.P. 26(e)(2). By their own admission, defendants have marketed the Dali Lithographs without interruption since this lawsuit was filed. The court finds it difficult to believe that defendant never once printed out a copy of its remaining inventory at any point from 1985 (when Dr. Cunitz' stopped consulting for them) to October 1989, when this trial began. They had no difficulty producing a printout on a moment's notice on the last day of trial.

Defendant's abuse of discovery, failure to list the documents in the pretrial order and its production of responsive documents on the eve of trial—and, even more disturbingly, in the middle of trial—would have fully justified the court's wholesale exclusion of all the inventory evidence. *See Cine Forty–Second Street Theatre*, 602 F.2d at 1068. The court did not impose such drastic sanctions, however. It allowed some offers of inventory evidence and denied others, guided by its perception

of how much prejudice plaintiff had suffered from the late disclosure.

Since the court could have precluded all defendant's inventory evidence, *a fortiori*, it was justified in submitting some to the jury, with instructions on how to consider it. Contrary to what defendant claims, the court did not instruct the jury to examine the possible surprise to plaintiff. Its instructions on the discovery issue were as follows:

Under the Federal Rules of Civil Procedure, which govern all actions in the federal courts, the parties to a lawsuit are entitled to ask for the production of records and information from other parties in the litigation. The Rules also provide that the party who receives such a request must comply with it fully, in good faith, and must supplement its response in the future if it later acquires information that would have been responsive in the first instance. Contrary to what you might have thought from television and movies, civil trials are not supposed to involve surprise, although that sometimes occurs. The discovery procedures outlined in the Federal Rules are designed to further that objective and eliminate the possibility of one side having superior knowledge of the facts and resultant advantage at trial.

On the other hand, a party is required only to respond to those requests put to it; there is no requirement for a party to volunteer information that has not been requested. Further, if the party propounding a request is dissatisfied with a response, it may, during the discovery process, ask the court to order the other party to provide a more satisfactory response. This, of course, assumes that it knows specifically what it is looking for and can determine whether a response is inadequate. Therefore, for example, if a party's reply to a discovery request indicates that it has no responsive documents, it might not be reasonable to expect the party propounding the request to seek a court order unless it had some other reason to believe that such documents did, in fact, exist.

In this case, plaintiff has claimed that defendant did not properly respond to one specific request during discovery having to do with Collectors' Guild's revenue from the sale of Dali lithographs. If you find that defendant engaged in any wrongful conduct—such as destroying data after it had been sought in a proper discovery request or unreasonably delaying the production of records sought in such a request—and if you further find that such wrongful conduct contributed to plaintiff's inability to establish its damages with certainty, then you may take into account the fact that plaintiff was denied the opportunity to investigate such evidence, and that it could not take its own discovery, which might have allowed it to develop other evidence to challenge evidence introduced by defendant during the trial.

In all instances, you are to use sound discretion in fixing an award of damages, drawing reasonable inferences where you deem appropriate from the facts and circumstances in the case.

The court's concern was that, absent such an instruction, the jury might find even the limited amount of defendant's financial data that had been admitted more persuasive than plaintiff's circumstantial theory discussed above. In light of defendant's apparent misconduct, and its fault in putting plaintiff in such a disadvantaged position, short of declaring a mistrial (which plaintiff did not seek) there was no other way to rectify the harm except to let the jury know why plaintiff might not have been able to counter all of defendant's evidence. The instructions were simply advisory. They instructed the jury that, if they found that defendant had caused plaintiff to be denied access to the evidence before trial, then they could consider that fact in examining whether plaintiff had met its burden of proof. Under these circumstances, the instructions were appropriate.

As noted above, counsel for plaintiff sought to persuade the jury during his summation that defendant had sold a total of 12,500 lithographs. He did so by asking the jury to infer that defendant eventually had only 1000 lithographs out of the origi-

nal acquisition left. To do so, he urged it to accept as true, Munn's 1987 letter to Diner's Club cardmembers, in which he stated that only 200 of each image were left when Diner's Club commenced marketing the lithographs. As part of its post-trial motions, however, defendant has submitted evidence from independent auditors corroborating its claim that it still has a substantial inventory of unsold lithographs on hand, 5443 prints, to be specific. *Statement of Ernst & Young*, dated October 23, 1989 (attached to Affidavit of Max Munn, sworn to on October 25, 1989). No matter whether Munn's Diner's Club statement was an outright falsehood or, as he claims, simply a creative description of marketing plans, *see* Def. Reply Mem. at 14, the basis for inferring that only 1000 prints were left appears to have been at odds with the facts.

The court observed the jury's reaction to the testimony and finds it unlikely that they rejected defendant's assertion that it experienced a loss, while accepting its arguments that it had nearly 6000 prints still in inventory. The two areas shared a common feature: they both depended on the credibility of defendant's witnesses. Since each claim, profit margin and inventory, required the jury to accept defendant's uncorroborated assertions, it is likely that if the jury rejected one, it rejected the other as well.

Nevertheless, even if the jury adopted the inventory figures as they have been presented to the court—namely, that defendant has 5443 on hand—its award would still have been reasonable as a matter of law. If, for example, the jury decided that defendant received 15,000 images from LeShufy, and subtracted the 5443 defendant claims are still unsold, it would have concluded that 9557 lithographs, rather than 12,500 (the amount claimed by plaintiff) had been sold. Dividing $2,280,000 (twice the profit awarded to plaintiff) by 9557 means the jury would have had to conclude that defendant realized a profit of $239 on each sale. On a per-item basis, that is not much higher than the $190 figure the jury presumably used.

Defendant claims that the sales figures plaintiff argued to the jury were too high because plaintiff erroneously assumed that Collectors' Guild began with between 14,000 to 15,000 lithographs, rather than the 12,000 defendant claims was established in the evidence. For example, in a post-trial affidavit, Dr. Cunitz states that LeShufy delivered a total of only 12,000 Dali lithographs to Collectors' Guild. *See* Affidavit of Jonathan A. Cunitz, sworn to October 24, 1989, ¶ 5. That assertion contradicts the trial testimony of LeShufy himself.

In his direct testimony, LeShufy did not testify about the number of lithographs he had originally produced. During cross-examination, however, the following exchange occurred between LeShufy and counsel for plaintiff:

Q. How many in total of these lithographs did you deliver to Collectors Guild?

A. Approximately a thousand.

Q. Approximately a thousand?

A. Yes.

Q. 1,000 of each—

A. Of each image. I'm sorry.

Q. So if there are 13 images, you delivered approximately 13,000, correct?

A. A little bit more because actually— about 1,200 as I recall.

Tr. at 284–85. Simple arithmetic reveals that 1200 times 13 is 15,600, a figure even higher than that urged on the jury by counsel for plaintiff. Counsel for defendant never addressed this testimony during redirect examination and the jury was entitled to accept it. Dr. Cunitz' post-trial statements to the contrary are a legal nullity.

Moreover, the court sees no reason, in its discretion, to consider them in assessing the reasonableness of the jury's verdict. Dr. Cunitz had a substantial personal involvement in this case, and his statement is not based on personal knowledge but on information provided by defendant. In contrast, the post-trial statements of Ernst & Young, represented first-hand information of an independent source. Therefore, although the court has credited the inventory conducted by Ernst & Young, it finds

**985**

little reason to give more credence to the second-hand information compiled by Dr. Cunitz than the first-hand trial testimony of Mr. LeShufy. If anything, it would probably attribute less weight to Dr. Cunitz' statements.

It bears repeating that, as a matter of law, the jury was entitled to accept plaintiff's theory explaining the number of lithographs likely remaining in defendant's inventory. It also bears repeating that defendant's inability to counter plaintiff's arguments with hard evidence resulted from its misconduct during the discovery process. As a matter of law, therefore, the jury's verdict is supportable.

■ But assuming, for the moment, that the jury used the $190 figure for per-item profit, plaintiff's erroneous assumption that there were 4443 more lithographs sold than had actually been the case, means the jury likely factored in $844,170 more in net profits than it should have. Dividing that figure in half, to reflect plaintiff's contractual share in the profits, means the damage award was probably $422,085 too high. Subtracting that figure from $1,140,000 leaves $717,915.

On this basis, the court believes the jury's award should equitably have been close to this figure. Even accepting that the jury's picture of the relevant facts was skewed by defendant's own misconduct, an award that may be nearly sixty percent over what the actual facts suggest is too high a price to pay, even for the type of behavior engaged in by defendant during the discovery process.

If a new trial on damages were held, after full discovery on the damage issue, plaintiff—who might be confronted with hard evidence refuting its assumptions—might very well end up with an award much smaller than $717,915. Since it was the victim of defendant's misconduct, however, it should not be denied the opportunity to try the case again. If it elects to do so, the court will entertain a motion for sanctions that compensates plaintiff for expenses incurred during the first trial that are attributable solely to defendant's wrongful conduct. In all likelihood, that

would include attorney's fees incurred during the presentation of the damage phase of the trial and in responding to defendant's excessive verdict motions. Plaintiff shall have fifteen days in which to decide how it wishes to proceed.

## CONCLUSION

Defendant's motion for judgment notwithstanding the verdict is denied. The $1,140,000 verdict is set aside as to the amount of damages only and a new trial granted plaintiff on that issue unless, within fifteen days from the date of this decision, plaintiff agrees that the verdict be reduced to the sum of $717,915. Such agreement shall be indicated by a writing filed with the Clerk of this Court. Settle judgment in accordance with this opinion.