United States Court of Appeals,

Eleventh Circuit.

Nos. 94-4838, 95-4090.

Michael J. ESKRA, Plaintiff-Counter-Defendant, Appellee/Cross-Appellant,

v.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant-Counter-Claimant, Appellant/Cross-Appellee.

Michael J. Eskra, Plaintiff-Counter-Defendant-Appellee,

v.

Provident Life and Accident Insurance Company, Defendant-Counterclaimant-Appellant.

Oct. 27, 1997.

Appeals from the United States District Court for the Southern District of Florida. (No. 92-122-CV-EBD), Jacob Mishler, Judge.

Before HATCHETT, Chief Judge, BLACK, Circuit Judge, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

Defendant Provident Life and Accident Insurance Company ("Provident") appeals the judgments for plaintiff Michael J. Eskra, and Eskra cross-appeals the denial of "front-pay." We affirm the judgments and the denial of front pay. We also grant Eskra's motion for an award of appellate attorney's fees, and remand with instructions to assess the amount of appellate attorney's fees to be awarded Eskra.

I. BACKGROUND

Eskra began his employment with Provident in 1961. In 1969, he was appointed manager of the Miami branch office over a territory that included most of South Florida. His performance was rated as "outstanding." As one of the Accident Department's most productive branch managers with business earnings of $25,000,000, Eskra personally earned about $700,000 in 1990. Under his tenure, the Miami business grew and he opened district offices in Fort Myers, Fort Lauderdale, and West Palm Beach. The Fort Myers and West Palm Beach offices were opened as a matter of Eskra's

own judgment, and the expenses associated with their development were charged against his incentive compensation.

Provident's branch offices were managed by employees, like Eskra, who had no written contracts and were employed "at will," or were managed by "general agents" who had written contracts and were characterized as independent contractors.

Employees were compensated based on a percentage of premiums earned by Provident for the policies sold through their branch offices: 10% for the first five years, 5.5% for all annual renewals thereafter. The payments were based on the 1972 "Chandler Papers" accounting system: an "operating statement" was set up for each branch office in which the commissions earned by the manager ("allowances") were credited as a "percentage of earned premium" on both first year and renewal policies. From these "allowances," Provident deducted the operating expenses of the branch office and any divisional offices, and the manager's "salary"; the balance was paid quarterly as "incentive compensation" to the branch manager. Losses against the office were not deducted. An "allowance" was paid only while the manager was in charge of a territory; if the manager was terminated or transferred, or if the territory was split, the annual incentive compensation (net allowances) reverted to Provident.

The general agents were not employees of Provident. They were paid "commissions," "overwriting commissions," or "first year and renewal commissions," which were based on a percentage of premiums earned by Provident for both new and renewed policies, and each paid his or her own expenses. These agents were guaranteed a "vested" payout of the renewal commissions generated by their business for ten years if their contracts were terminated, and had a "claim on the stream of commission payments and overwrites" that would accrue during the future ten years. The amount was determined by a "vested commission evaluation," based on the present value of the renewal commissions which determined the "independent agent's future commissions receivable."[1]

---

[1]R16 at 1277-1279.

Under the Accident Department's Chief Officer David Fridl, Provident began in the 1980s "buying-out" managers when it assumed their territories. The buy-outs were based on a "vested commission evaluation" program used for general agents. Eskra and Fridl had a close relationship, and Fridl frequently confided in him. In 1985 or 1986, at a meeting between Fridl and a small group of senior managers, Eskra and another senior manager expressed concern over their security with Provident. Fridl put their fears to rest by telling them that they could rely upon the continuation of the buyout practice. John Barnes succeeded Fridl as Chief Officer in 1986, and continued the buyout of managers' blocks of business when their territories were assumed. In 1987, Provident proposed that buy-outs be based on the "vested commission evaluation," discounted by a 2% service fee and a persistency factor that "may be more or less than 30%," and cease if the manager died, retired, or was terminated during the payout term.

Ralph Christiana succeeded Barnes as the Chief Officer in 1989. In 1990, Christiana began restructuring the incentive compensation program for branch managers, and dividing more of their territories. Christiana stopped the buy-out practice and "vested commission evaluations," and substituted "transition payments," consisting of three, four or six quarters of the manager's current annual incentive compensation, based on what he thought fair. During 1990, the Fort Myers' division office was converted to a branch, and Eskra was paid credits for the lost business for six quarters. In November 1990, Eskra was advised that the Fort Lauderdale office would be converted to a branch.

Eskra was informed in January 1991 that the Fort Lauderdale office would be closed, and the West Palm Beach divisional office would be converted to a branch office, with the Fort Lauderdale business split between Miami and West Palm Beach. Eskra was offered credits generated by the lost business (about 25% of the Miami business) for four quarters. Provident hired a 44-year-old female with eight years' experience as the West Palm Beach office manager. She began work in July 1991.

Meanwhile, a Provident task force and the chief financial officer recommended that the Miami and Los Angeles offices be closed because they had a history of consistent and enormous losses over the past eleven years, and Provident had decided that there was no way to stop losses on newly written policies.  Christiana decided to close the Miami office, and met with Eskra on June 27, 1991.  Christiana offered Eskra a position as branch manager in Pittsburgh with a salary of $120,000;  a one-year guarantee of $80,000 incentive compensation;  a one-time "transition payment" of $600,000 (three quarters of Eskra's 1990 earnings);  and no guarantees on the years after that, and informed him that he would be terminated if he did not accept the transfer.  Although Eskra asked for a transfer to the West Palm Beach office, he was told the "decisions have already been made."  Eskra responded that the proposed buyout was only part of a single year's business;  he had been promised that his renewal commissions would be bought if he were ever replaced;  Provident had a long history of buying renewal commissions;  and he was willing to accept a transfer if Provident would be "fair in the buy out of my territory."  In response, Christiana repudiated the buyout practice, and told Eskra that he could accept the Pittsburgh offer or be terminated.  Eskra did not accept the transfer because the buyout issue was not resolved, and he was terminated on September 6, 1991.

Eskra, then 61 years old, filed this action against Provident, alleging violations under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-33a, and Florida contract and tort law.[2]  Provident answered and counter-claimed various state law claims.[3]  The district court granted summary judgment on all of Eskra's claims except those under the ADEA and implied contract law and granted summary judgment or dismissed Provident's claims.  Following a jury trial on the ADEA and implied contract claims, the jury returned verdicts for Eskra for $213,400 on his ADEA claim, and $5,632,000 on his implied contract claim.  Provident moved for judgment

[2]Eskra claimed that Provident had violated the ADEA, breached his express and implied employment contract, defamed him, and was bound by promissory estoppel.

[3]Provident alleged that Eskra had breached the faithless servant doctrine, his fiduciary duty, and the duties of fidelity to perform duties faithfully, and had converted its property.

notwithstanding the verdict as a matter of law on the claim for breach of implied contract and, alternatively, for a new trial on the issue of liability and/or damages. The district court denied Provident's motion for judgment notwithstanding the verdict, but found the award of compensatory damages for breach of implied contract excessive and unsupported by the evidence, and ordered a remittitur. The district court vacated the answer to interrogatory eight of the verdict (as to the monetary value of any breach of an implied contract), and granted a new trial on the issue of damages resulting from the breach of implied contract unless Eskra accepted a remittitur.[4] Eskra declined the remittitur. On retrial, the second jury awarded Eskra $4,432,258.00 and $1,696,050.60 interest on the contract claim. Provident appeals the judgments. Eskra cross-appeals the denial of "front pay" on the ADEA claim.

## II. ISSUES

(A) Sufficiency of the evidence

(1) The ADEA claim

Provident argues that the evidence was insufficient to show that (1) Eskra was adversely affected since the transfer would have provided him more money initially than he was making in Miami, and he voluntarily stopped working for Provident; (2) he was not replaced with a younger employee; and (3) the reasons for changing the Miami office were not pretextual. Despite Eskra's argument to the contrary, Provident raised these issues in its motion for directed verdict and renewed its motion on all claims at the close of the evidence. Therefore, these issues are properly before this court.

To prove discriminatory treatment violating Title VII, a plaintiff must first establish a prima facie case of discrimination.[5] The same analysis applies to ADEA cases.[6] If the plaintiff presents

---

[4]The district court allowed a remittitur of $1,200,000.

[5]*Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1073 (11th Cir.1995).

[6]*Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1469 (11th Cir.1991).

5

direct evidence that a "discriminatory animus played a significant or substantial role in the employment decision, the burden shifts to the employer to show that the decision would have been the same absent discrimination."[7] The ADEA prohibits discrimination by an employer based on an employee's age.[8] A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.[9]

Absent direct evidence of discrimination, a plaintiff in a termination case must establish a prima facie case by showing that (1) he is member of a protected class, (2) he applied for and was qualified for the job, (3) despite his qualifications, he was rejected, and (4) the position remained open or was filled by a person outside the protected class.[10] In an ADEA action, the plaintiff is not required to show that the replacement employee was under the age of 40, and outside the protected class.[11] If a prima facie case is established, the inference is raised that discriminatory intent motivated the adverse employment action, and the burden shifts to the employer to "clearly articulate in a reasonably specific manner a legitimate non-discriminatory reason" for the adverse action.[12] If the employer satisfies this burden, the burden again shifts to the plaintiff to show that the proffered reason is a pretext for the true discriminatory reason.[13] The transfer of an employee which results in a substantial reduction in the employee's income is an adverse employment action.[14]

---

[7]*Haynes v. W.C. Caye & Co.,* 52 F.3d 928, 931 (11th Cir.1995).

[8]*O'Connor v. Consolidated Coin Caterers Corporation,* U.S. , --- U.S. ----, ----, 116 S.Ct. 1307, 1310, ,134 L.Ed.2d 433 (1996).

[9]*See Mauter v. The Hardy Corporation,* 825 F.2d 1554, 1557 (11th Cir.1987).

[10]*Coutu,* 47 F.3d at 1073; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

[11]*O'Connor,* --- U.S. at ----, 116 S.Ct. at 1310.

[12]*Id.*

[13]*Id.*

[14]*Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1519 (11th Cir.1990); *Maddow v. Procter and Gamble,* 107 F.3d 846, 852 (11th Cir.) *Reh'g denied* (1997).

Eskra attempted to show direct evidence of discrimination through internal documents of Provident. John Barnes, an earlier Chief Officer of the Accident Department, wrote a memo in May 1988, in which he remarked that it was "to the company's advantage" to have a manager older than age 65 retire, since "the incentive compensation normally paid to him reverts to the company."[15] In 1990, Robert Fowler, a principal subordinate and advisor to Christiana, who was Chief Officer of the Accident Department, made a notation on his copy of a proposal to eliminate renewal commissions as part of a branch manager's incentive compensation[16] that stated "economic incentive to get rid of older managers."[17] There does not appear to have been any evidence that either Barnes or Fowler were involved in the decision to establish the West Palm Beach office or to close the Miami office. Therefore, it does not appear that these documents showed direct evidence of discrimination.

Eskra's insurance expert testified that, between November 1987, and September 1991, 70% of Provident's managers adversely affected by territorial assumptions, forced retirement, or office closures were over 50 years of age, and those affected managers were half of the managers in the over-50 age group. The testimony also showed that the pattern of affected offices could not have occurred but for age being considered as a factor, and that there was no correlation between the affected offices and their profitability. Although testimony on the adversely affected managers combined with evidence of discriminatory intent could be considered direct evidence, in this case it does not appear there was a sufficient basis for direct evidence of discrimination.

However, Eskra has established a prima facie case of age discrimination. Provident does not contest that Eskra was in the protected age group and was qualified for the job. Despite Provident's claim that there was no adverse action, it was uncontested that Eskra's proposed income from a transfer to Pittsburgh after the first year was not guaranteed to be equal to his income in

_____

[15]Plf. Exh. 1.

[16]Plf. Exh. 2.

[17]Plf.Exh. 3.

7

Miami. The evidence established that Eskra was replaced by a person outside the protected class: 44-year-old Francene Markman. Ms. Markman was introduced to the Miami insurance community by a half-page advertisement in a trade magazine, which said that she "assumes significant responsibility of expanding Provident's presence in South Florida."[18] In August 1991, Markman was provided a list of all agents in Eskra's territory and began making calls on them. Christiana wrote letters to many agents in Eskra's territory advising them that Provident wanted to "continue to work with you. Your new branch manager is Francene Markman...."[19]

Ronald Howard Abraham, an agent in Eskra's former territory, testified that he continued to sell policies in the territory, there were no changes to "business as usual" and, although business dried up in the southern half of the territory, it was because Provident's current product was not as competitive as its earlier product.

Once Eskra proved discrimination, the burden shifted to Provident to show the reasons for the adverse action.[20] Provident presented evidence that the action was due to the lack of profitability of the Miami office. The evidence showed that Provident lost over $29,000,000 in Miami from 1980 to 1990, and most of the losses were attributable to an old policy. Testimony showed that the decision was based on the knowledge that, although closing the office would have little effect on claims on the policies already sold, it would limit the number of new policies sold, and the capital could be used more productively elsewhere.

Despite a 1991 report showing that the claims experience in Miami on the new policy was too small to permit any reliable conclusions and a concession that the Miami experience was essentially the same as the rest of Florida, Provident's chief actuary in the Accident Department, Nick Bieter, projected losses in Miami, and recommended closing the Miami office to new business. Eskra's expert testified that Bieter's recommendation "grossly biased the results in favor of

[18]R8 at 206-210; Plf. Exh. 49.

[19]R8 at 214-215, 219-221; Plf. Exhs. 73-74.

[20]*Coutu,* 47 F.3d at 1073.

unprofitability" and ignored several policy changes that were to be carried out within a few months, both of which would have increased profitability.[21]

Based on the evidence summarized above, there was sufficient evidence for the jury to find that (1) Eskra was adversely affected and did not voluntarily stop working for Provident; (2) he was replaced with a younger employee; and (3) the reasons for closing the Miami office were pretextual.

(2) Implied contract

Provident argues that the evidence was insufficient to show that it had an implied contract with Eskra, or that the implied contract required that he be paid the value of a percentage of the premiums after he no longer managed the territory. Eskra responds that the parties' conduct throughout the years established a contract for compensation of the value of the future stream of renewal commissions when a manager's territory was assumed.

Under Florida law, "the test of an implied contract of employment is whether services were performed under circumstances fairly raising a presumption that the parties understood and intended that compensation was to be paid."[22] Contracts implied in fact are inferred from the facts and circumstances of the case.[23] When the parties continue to perform as before after an agreement is reached, an implication arises that the parties have assented to a new contract that raises a genuine issue of material fact properly submitted to a jury.[24] In Florida, where a contract of employment is terminable at will by either the employer or employee, continued employment, in itself, is sufficient consideration to support a promise, express or implied, made during the relationship.[25] Where the existence of a contract is clear, but the terms about how much an employee would receive is

---

[21]R16 at 1110-1118, 1120-1134; Def. Exh UU.

[22]*Tipper v. Great Lakes Chemical Company,* 281 So.2d 10, 13 (Fla.1973).

[23]*Mecier v. Broadfoot,* 584 So.2d 159, 161 (Fla.Dist.Ct.App.1991).

[24]*Id.* at 161, citing *Rothman v. Gold Master Corp.,* 287 So.2d 735, 736 (Fla.Dist.Ct.App.1974).

[25]*Coastal Unilube, Inc. v. Smith,* 598 So.2d 200, 201 (Fla.Dist.Ct.App.1992), quoting *Wright & Seaton, Inc. v. Prescott,* 420 So.2d 623, 628 (Fla.Dist.Ct.App.1982).

9

unspecified, a jury is empowered to award a reasonable amount of compensation.[26]  The impossibility of the calculation with "absolute exactness" will not defeat recovery where a long track record of a business provides a solid foundation for reasonable projections.[27]

As noted above, the evidence showed that Provident began "buying-out" managers in the 1980s when it assumed their territories based on a "vested commission evaluation program."  Fridl put Eskra's concerns about his security with Provident to rest by telling him that he could rely upon the continuation of the buyout practice.[28]  Following the discussions with Fridl, Eskra continued to devote himself to selling Provident's policies and building his block of business for the future as evidenced by his "outstanding" evaluations.  Fridl's successor, John Barnes, continued the buy-outs of the managers' blocks of business when their territories were assumed.  In 1987, Provident proposed that the buy-outs be based on the "vested commission evaluation" in a supplement to the Chandler Papers.  Provident's damage expert, Lawrence Marsh, testified that the term "renewal commission value" was common terminology in the insurance agency business although it "may be grouped together differently, (or) the words appear in a different sequence...."[29]

Further, there was mutual assent of the parties.  Provident's assent was shown through its consistent, decade-long commitment to the practice, its consistent use of its vested commission evaluation program to buy out managers, the reduction of the practice to writing, and Fridl's promise to Eskra that the practice would not be abandoned.  Eskra's assent was shown by his knowledge of

---

[26]*Community Design Corporation v. Antonell,* 459 So.2d 343, 345-346 (Fla.Dist.Ct.App.1984), *review denied,* 469 So.2d 748 (Fla. 1985).

[27]*Litman v. Massachusetts Mutual Life Insurance Company,* 739 F.2d 1549, 1559, *reh'g denied,* 746 F.2d 815 (1984), quoting *Twyman v. Roell,* 123 Fla. 2, 166 So. 215, 217 (1936) and citing *McCall v. Sherbill,* 68 So.2d 362 (Fla.1953) and *New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.,* 122 Fla. 718, 166 So. 856 (1935).

[28]R9 at 373-374, 515-516;  R11 at 659-660;  R25 at 315-316.  Fridl retired in 1986, and died the following year.

[29]R27 at 755;  R28 at 753.

the commitment, his continued service to Provident, and his expectation that he would be treated as Fridl promised.

Therefore, the evidence was sufficient for the jury to find that an implied contract was created.

(B) Limited cross-examination of Eskra's damages expert

Provident argues that the district court erred by permitting Eskra's expert damages witness, Dr. Jonathan Cunitz, to testify about his knowledge of the insurance industry. This court reviews the decision whether to allow someone to testify as an expert witness for abuse of discretion.[30]

Cunitz testified that he was "reasonably familiar with the way insurance agents and managers and brokers are paid on a general basis by insurance companies,"[31] had been qualified to testify as an expert in about eight different cases involving "renewal commissions" in the insurance industry, and believed that he was qualified in the area of valuation of renewal commissions of insurance agents. Cunitz was tendered as an expert "in the field of financial analysis and accounting for the purpose of damage calculations in this case."[32] Although Provident accepted Cunitz "as an expert in accounting and calculating the accounting necessary to advance Mr. Eskra's claim," it objected "to his being qualified as an expert on matters relating to the insurance industry and matters relating to the insurance policy of Provident."[33] The district court overruled Provident's objection, finding Cunitz "highly qualified to express an opinion ... in the field in which he expressed his expertise."[34] Further, Provident's witness Christiana conceded that Cunitz's methodology was "certainly" a permissible way to calculate renewal commissions.

---

[30]*Manufacturing Research Corporation v. Graybar Electric Co.,* 679 F.2d 1355, 1366 n. 21 (11th Cir.1982), citing *Barnes v. General Motors Corp.,* 547 F.2d 275, 278 (5th Cir.1977).

[31]R26 at 338.

[32]R26 at 339.

[33]R26 at 348.

[34]R26 at 339, 346-348.

11

Based on Cunitz's testimony, it does not appear that the district court abused its discretion in allowing him to testify as an expert "in the field in which he expressed his expertise."

Provident also argues that the district court abused its discretion by refusing to permit it to question Cunitz about his testimony in another case. Provident sought to introduce two judicial opinions to impeach Cunitz's "(n)ever" answer to its question about whether he had ever been disqualified by any court or whether his opinion had ever been rejected because he exceeded his professed expertise.[35]

In *Parkway Garage, Inc.,* Cunitz was proffered as an expert with respect to making of financial projections and the analysis of financial statements and the court accepted his qualifications in that regard.[36] However, Cunitz's opinion on the issue of proximate causation was rejected as "unreliable" because he was "never proffered as an expert on the parking industry, and he freely admitted that he did not purport to be such an expert."[37]

In *Werbungs Und Commerz Union Austalt,* the jury rejected the defendant's damage theory that was supported by Cunitz's testimony in favor of the plaintiff's damage theory. The district court sustained Eskra's objection to the introduction of these opinions, finding the *Parkway Garage, Inc.* opinion not relevant, "an entirely different subject," and the statements unfair.[38]

Neither of the proffered opinions specifically hold that Cunitz's testimony on damages had been rejected for exceeding his expertise. Therefore, the district court did not abuse its discretion in excluding them.

(C) Jury instructions and special verdicts

(1) Jury instructions in the first trial

---

[35] *Parkway Garage, Inc. v. City of Philadelphia,* No. 90-7752, (E.D.Pa.1994); *Werbungs Und Commerz Union Austalt v. Collectors Guild, Ltd.,* 728 F.Supp. 975, 978 (S.D.N.Y.1989), *rev.'d on other grounds,* 930 F.2d 1021 (2nd Cir.1991).

[36] *Parkway Garage, Inc.,* at 7-8.

[37] *Id.*

[38] R31 at 464-466.

12

Provident argues that the district court erred in its instructions to the jury.[39] The errors include (1) the failure to require proving "offer and acceptance" and "consideration" for a Florida implied contract; (2) improperly defining and using the terms "renewal commissions," "block of business" and "overwriting commissions"; (3) improperly permitting the jury, by Special Verdict 3, to decide only whether there was a contract to "compensate Eskra for the renewal commission value" and not the value of damages; and (4) improperly instructing that "Eskra expend(ed) sums reasonably necessary ... on behalf of Provident" and thereby establishing consideration for the implied contract.[40] It argued that these errors were perpetuated in the second trial because the only issue retried was how the jury should decide the "renewal commission value."[41]

This court applies " "a deferential standard of review to a district court's jury instructions. If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instruction.' "[42] If the instructions as a whole correctly instruct the jury, even if technically imperfect, no reversible error is committed.[43] The same deferential standard is applied to a special interrogatory verdict form.[44] The question of whether the instructions and verdict form accurately reflect the law is reviewed *de novo*.[45]

The district court's instruction on the breach of implied contract was:

---

[39]Provident includes arguments as to errors in the district court's jury instructions during the first trial on the issue of damages for the implied contract claim. The district court vacated the jury's answer to interrogatory 8 and ordered a retrial on the issue of damages from the breach of implied contract. Therefore, these issues are moot.

[40]Provident's brief at 20-25.

[41]*Id.* at 25.

[42]*Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543, *reh'g denied* (11th Cir.) (quoting *United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir.1995) [citing *McElroy v. Firestone Tire & Rubber Co.,* 894 F.2d 1504, 1509 (11th Cir.1990) ] ), *reh'g denied* (1996).

[43]*Id.* [citing *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir.1981) ].

[44]*McNely v. Ocala Star-Banner Corporation,* 99 F.3d 1068, 1072 (11th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3587 (Feb. 18, 1996).

[45]*Id.* (quoting *United States v. Starke,* 62 F.3d at 1380.)

Eskra also claims that Provident breached an implied contract or a contract implied in fact, to vest or guarantee the renewal commissions on his block of business if the Miami territory was taken from him by the company, and pay for the value of those renewal commissions.

The terms of the contract may be express or implied. The express terms of a contract are stated in words. The implied terms of the contract are shown by conduct.

A contract implied in fact is similar to an express contract in that the parties intend and mutually assent to each other's performance. However, their assent and the terms of the contract are not expressly stated, but are implied from their acts and conduct, as well as from the facts and circumstances surrounding the acts and conduct.

Eskra claims that Provident established a practice of compensating branch managers for the value of any block of business Provident took away from the branch manager. Branch managers receive overwriting commissions on premiums paid on policies in-force in the manager's territory. Eskra claims that the expense incurred by the branch manager in developing this block of business was a consideration for the implied promise to pay the branch manager for the loss of the block of business.

In order to recover on his claim of breach of implied contract, Eskra has the burden of establishing by a preponderance of the evidence:

1. By the conduct of Eskra and Provident, it was understood by the parties that in consideration of Eskra expending sums reasonably necessary to obtain policyholders for Provident policies and the effort extended on behalf of Provident, a contract for the payment of the value of overwriting commissions on the premiums paid by policyholders or renewal is implied.

2(A). The amount of the payment was equal to Eskra's—and this is only Eskra's claim. I don't indicate in any way, and I have no right to suggest or make any findings—this is Eskra's claim.

2(A). The amount of the payment was equal to Eskra's over the following ten-year period based on the overwriting commissions on the policies in effect on July 16, 1991 (the day Eskra was informed that the Miami office would be closed) less 20 to 30 percent deduction for anticipated lapsed polices during the ten-year period; or—and I'm saying if the plaintiff Eskra has not proved that formula—or

2(B). It is implied from the conduct of the parties that they agreed that Provident would pay and Eskra would receive a reasonable sum therefor.

If you find an implied contract, but you also find that the parties did not impliedly agree to a formula as contended by Eskra, but that the parties did agree that Provident would pay and Eskra would receive a reasonable sum, then the jury will award such sum as it finds is reasonable.

Eskra cannot rely merely on his subjective expectation. Subjective expectation means on what he solely believed or what his hopes were. Eskra cannot rely merely on his subjective expectation that he had been a good employee and that the performance of good employees should be rewarded beyond his annual compensation.

14

Mere expectations are insufficient to create a contractual binding term of employment. Without employment terms that are definite and certain, you must find in favor of Provident and against Eskra.

Unless you find that Eskra has proved the existence of such an implied contract, then you must find that there was no contract and you must find a verdict for Provident.[46]

This instruction was clear, did not mislead the jury, and was a correct statement of Florida law. Florida courts have held that contracts implied in fact are inferred from the facts and circumstances of the case,[47] and the parties mutual assent to the contract may be implied from their performance.[48] Also, it is clear that the jury was instructed that Eskra had to show evidence of consideration in order to establish an implied contract. The district court did not define the terms "renewal commissions" or "block of business" but merely restated Eskra's claim. Further, although the district court offered, with Eskra's agreement, to use the word "credits" instead of the term "commissions," Provident declined the change in favor of "commissions." Although the jury was given the option of using the "Barnes" formula for payment of the overwriting commissions less 20 to 30 percent, it was also given the option of awarding a reasonable sum. No method of calculation for a "reasonable sum" was provided and the jury was not limited by the instruction. Therefore, these arguments appear frivolous.

Special Verdict 3 read:

Did Eskra prove by the preponderance of the evidence that Provident breached an implied in fact contract to compensate Eskra for the renewal commission value of the territory assumed by Provident in 1991?

Although Provident argues that this wording limited the jury's determination as to the method of calculation of damages to "renewal commission value," the calculation of damages was provided for in Special Verdict 8[49] and no method of calculation was specified. Because the question simply

---

[46]R22 at 2079-2082.

[47]*Mecier,* 584 So.2d at 161.

[48]*Rothman,* 287 So.2d at 736.

[49]Special Verdict 8 read "If you answered "yes' to Special Verdict 3, what amount of money, if any has Eskra proved by the preponderance of the evidence to be his compensatory damages

15

asked whether Eskra had proven his breach of implied contract claim, Provident's argument as to the calculation of damages is frivolous.

(2) Jury instructions and special verdicts during damages retrial

Provident argues that the district court erred in the retrial by requiring the jury to find some amount of damages, and forced them to calculate the damages by the "renewal commission value" formula. It maintains that the district court erred in failing to give the jury the option of awarding "zero" damages, and to instruct them that the amount of damages should be reasonable.

During the second trial, Provident presented eight alternate methods of calculation of damages, other than the "renewal commission value formula," in its opening statement, during the trial, and during closing arguments. One alternate calculation that Provident argued was for nominal damages of $1.00. Provident also discussed the need for the jury to award reasonable damages in its closing arguments.

The district court's jury instructions were:

> The sole issue of fact for your determination in your deliberations is the amount of damages that must be awarded to the plaintiff. Now, ... that does not in any way exclude your consideration of all the theories in awarding damages, assessing damages or all the methods of computing damages. That, of course, is part of your duty.

> Continuing. As I indicated at the beginning of this trial, a jury previously empaneled in this case has determined that Provident breached an implied contract to compensate Eskra for the renewal commission value of the territory assumed from him by Provident in 1991.

> You may not reconsider that finding. Accordingly, Eskra is entitled to recover from Provident as damages for such breach of contract as is shown by a preponderance of the evidence to have been the renewal commission value of the territory assumed from him by Provident in 1991 of not more than $4,432,258. Such renewal commission value is the sole fact you will be asked to determine on your verdict form.

> *   *   *   *   *   *

> In considering the issue of Eskra's damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full, just and reasonable compensation for the plaintiff's damages, no more and no less.[50]

---

caused by Provident's breach of the implied contract in fact?" The district court vacated the answer to this interrogatory.

[50]R29 at 917-918.

16

Special Verdict 1 stated:

What is the amount of damages you determine should be awarded to the Plaintiff Eskra as the renewal commission value, on September 6, 1991, of the territory assumed from him by Defendant Provident during 1991?

Neither the district court's instructions nor the interrogatory required the jury to award any set amount of damages or to calculate the damage award by any set method. Provident provided alternative methods of calculation and suggested an award of nominal damages. Provident and the district court directed the jury to award a reasonable amount of damages. Therefore, Provident's arguments as to the jury instructions during the second trial are frivolous.

(D) "Front pay" award

On cross-appeal, Eskra argues that the district court's denial of his claim for "front pay" on his ADEA claim was not legally adequate. Conceding that "front pay" would duplicate much of his implied contract damage award, Eskra requests reversal of the denial of "front pay" if the implied contract judgment is reversed for any reason. Provident responds that because the jury did not find "egregious circumstances" under the ADEA, he is not entitled to "front pay."

This court has held that "front pay" is warranted only by egregious circumstances.[51] Here, there are no egregious circumstances. Although the jury found that Provident had violated the ADEA by establishing the West Palm Beach office and by closing the Miami office, Eskra did not prove that Provident had acted with "reckless disregard" in establishing the West Palm Beach office, and the jury awarded no damages on that claim. The jury decided that Provident had violated the ADEA by closing the Miami office, but Eskra had not proven reckless disregard, and awarded $477,428 in front pay. The district court denied Eskra front pay, finding that if he had accepted Provident's offer, he would have overcome the cost of opening the office, payment of expenses, and reached earnings of $375,000 per year.

---

[51]*Lewis v. Federal Prison Industries, Inc.,* 953 F.2d 1277, 1281 (11th Cir.1992).

Even if Eskra is correct that the $375,000 figure was not adopted by Provident, Eskra had the opportunity to continue as a Provident employee. Therefore, no egregious circumstances were shown. It does not appear that the district court erred in denying front pay.

## III. CONCLUSION

For the reasons stated above, the appeals of the judgments for Eskra and the denial of front pay to Eskra are AFFIRMED.

## IV. OUTSTANDING MOTIONS

(A) Eskra's motion to strike pages 5-15 of Provident's reply brief or for leave to file a supplemental brief

Eskra moves to strike certain pages in Provident's reply brief or for leave to file a supplemental brief. He argues that Provident raised the issue of implied contract in its reply brief that was not raised in its initial brief. Provident responds that the issue *was* raised in its initial brief.

Provident addressed the implied contract issue in its initial brief within the argument on the jury instructions.[52] Eskra was provided an opportunity to respond in his initial brief. Therefore, the motion to strike and to file a supplemental brief is DENIED.

(B) Eskra's motion for attorney's fees

Eskra moves for appellate attorney's fees under the ADEA as the prevailing party. This court may award attorney's fees to a prevailing ADEA party where it determines such an award is appropriate.[53] Where an award is granted, the matter should be remanded to the district court with instructions to assess the amount of appellate attorney's fees to be awarded.[54]

Eskra successfully defends Provident's challenge to the verdict of a violation of the ADEA, and the award of damages. An award of appellate attorney's fees is therefore appropriate. We

---

[52]Provident's appellant brief at 24.

[53]*Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1052-1053 (11th Cir.1989), *cert. dismissed,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990).

[54]*Id.* at 1053.

GRANT the motion for attorney's fees and REMAND with instructions to assess the amount of appellate attorney's fees to be awarded Eskra on the ADEA issue.

AFFIRMED and REMANDED.