Robert F. DILLA, Hale P. Lane, Jr., and Dennis J. Eason, Plaintiffs,

v.

Togo D. WEST, Jr., Department of the Army, Secretary of the Army, Defendant.

No. CIV. A. 97–T–1003–N.

United States District Court, M.D. Alabama, Northern Division.

May 7, 1998.

Carlyle R. Hatfield, Jess Smethers, Oklahoma City, OK, for Robert P. Dilla, Hale P. Lane, Jr., Dennis J. Eason, Plaintiffs.

Brian C. Corneilson, U.S. Army Litigation Division, Arlington, VA, Patricia A. Snyder, Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Tom Majors, U.S. Attorney's Office, Oklahoma City, OK, for Togo D. West, Jr., Secretary, Department of the Army, Defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

The difficult legal issue raised by this lawsuit is whether, under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. §§ 621–634, an employer may consider a job candidate's eligibility for retirement in deciding whether to hire the candidate, where retirement eligibility and age are directly correlated, and cannot be independently analyzed. For the reasons that follow, the court concludes that retirement eligibility may be considered under such circumstances, provided the employer does not base his decision upon inaccurate and stigmatizing age-based stereotypes, such as a generalized assumption that older workers have a higher propensity to retire than younger workers.

Plaintiffs Robert F. Dilla, Hale P. Lane, Jr., and Dennis J. Eason filed this action on March 7, 1997, in the United States District Court for the Western District of Oklahoma, charging the defendant, the Secretary of the Army, with discriminating against them on the basis of their ages in violation of the ADEA.[1] This suit was transferred to this court from the Western District of Oklahoma by order entered June 25, 1997. The jurisdiction of this court is proper under 29 U.S.C.A. § 626.

The court conducted a non-jury trial on April 28–29, 1998. Based upon the above conclusion and the evidence presented at the non-jury trial, the court finds in favor of the Secretary of the Army and against the plaintiffs.

---

1. In their complaint, the plaintiffs also alleged a claim under the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701 through 796, and a claim that the administrative proceedings concerning their complaint of discrimination were infirm. However, the plaintiffs subsequently withdrew these claims. See order entered February 6, 1998; order on pretrial hearing, entered March 12, 1998, at 2.

## I. BACKGROUND

The pertinent facts of this case are as follows. In 1994, the United States Army Base at Fort Rucker, Alabama, advertised the availability of an Air Traffic Control Specialist position, at grade GS–12, with promotion potential to GS–13 (the "GS–12 trainee position"). The successful candidate was to be placed at the Cairns Army Airfield at Fort Rucker. Applications were received from at least 24 applicants, including the three plaintiffs in this action, Dilla, who was 48 years old at the time, Lane, who was then 49, and Eason, who was then 43. At the time they applied for the Fort Rucker position, all three plaintiffs were working as air traffic controllers at another United States Army base, Fort Sill, Oklahoma. Among the other applicants for the Fort Rucker position was a 29–year–old named Kevin Nolan, who was also working as an air traffic controller at Fort Sill at the time. Altogether, 16 applicants were deemed highly qualified for the position.

The person at Fort Rucker with hiring responsibility for the position was Dan R. Hinderliter, a 49–year–old, who served as the chief of the division in which the vacancy had arisen. Hinderliter had never before been the official responsible for making a hiring decision in the division, but he had served on various selection panels in the past. As a participant on one of those panels in August 1993, Hinderliter had recommended that a 53–year–old candidate be selected for an air traffic controller position.

Per standard division practice, Hinderliter convened a panel of supervisors within the division to assist him in evaluating the candidates for the GS–12 trainee position. The members of the panel were to evaluate the candidates and make a recommendation to Hinderliter regarding which candidate merited selection. Hinderliter and each panel member reviewed all applications, which were submitted on what is referred to as form SF 171, a standard federal job application form, but no interviews were conducted.

The panel and Hinderliter gathered for a meeting that lasted approximately 2 hours, in which the panel members discussed and debated the relative merits of the candidates. Although Hinderliter was present for much of this meeting, he did not actively participate in the discussion regarding the candidates' merit, but rather listened to the panel members' comments and responded to any questions they had concerning the position or the division's future plans.

As was traditionally true in the division, the panel strove for unanimity in its selection process. According to the undisputed record, each member of the selection panel had, upon independently reviewing the applications, determined that Nolan was his first or second choice for the available position. By the end of their meeting, each panel member had independently concluded that Nolan was his first choice, and the panel members then unanimously recommended to Hinderliter that Nolan be hired for the position. Hinderliter, upon review of all of the applications, accepted that recommendation, and on May 18, 1994, the position was offered to, and accepted by, Nolan.

Testimony by three members of the selection panel, Thomas Heisner, Leverett Phillips, and Clarence Evans, revealed the following additional facts concerning the selection process. Hinderliter had not provided the panel members with any guidance whatsoever regarding the criteria they should employ in selecting a candidate, nor did he relate to them what his own selection criteria would be or who he considered to be the top candidates. In making their choices, the three panel members who testified at trial considered any personal recommendations they received from individuals familiar with the candidates' work as air traffic controllers. The record showed that Nolan had received a strong recommendation from a person who had previously recommended other controllers who had been hired by Fort Rucker and had been found to be highly-qualified controllers.

Also, all three panel members who testified at trial considered the 'cost' of the various candidates, in terms of the salary that they would command under the 'pay-fixing' policy that was in effect at Fort Rucker. Pursuant to that policy, an employee's salary is adjusted upward in recognition of a previously-held higher governmental grade of employment.

In other words, the employee's salary is based upon the highest grade that he or she had achieved prior to coming to Fort Rucker, so individuals who had previously held higher grades than their colleagues would earn a higher salary even if they performed identical duties.

The record also establishes that Fort Rucker was under pressure to hold costs down and had been subject to numerous budgetary cutbacks prior to the decision to hire Nolan. Moreover, according to the uncontradicted evidence the air traffic control facility at Fort Rucker had the highest salary costs of any unit on the base, and was therefore under increased scrutiny as to its adherence to budgetary directives.

Another factor that two of the three panel members who testified at trial, Heisner and Phillips, relied upon was what they termed 'continuity.' This factor is related to the length of time that a candidate could be expected to stay at Fort Rucker before retiring, and is correlated with the length of time that exists before the candidate would become eligible to retire under the federal guidelines governing federal air traffic controllers. Both Heisner and Phillips sought to hire a controller who would not be eligible for retirement for several years and would therefore be likely to remain at Fort Rucker for a substantial period of time.

Under the federal guidelines that govern retirement eligibility of air traffic controllers, air traffic controllers are eligible for retirement with an annuity under the following formula: if they have worked for 25 years as federal controllers, they may retire at any age, and if they have worked for 20 years, they may retire at age 50. *See* 5 U.S.C.A. § 8336(e).

The record before the court establishes that, at the time Nolan was selected for the position at issue in this lawsuit, the air traffic controller workforce at Fort Rucker comprised 34 controllers, of whom 14 were eligible to retire at any time under § 8336(a), and of whom another four would be eligible to retire in fewer than five years. Four other positions had been eliminated prior to the selection of Nolan, and management expected more reductions-in-force in the near future. In addition, certain air traffic controllers at Fort Rucker were eligible for a voluntary separation incentive pay (VSIP) program, under which they would be paid up to $25,000 to accept early retirement, and 28 of the 34 controllers at Fort Rucker, who had been involved in the 1981 federal air traffic controller strike, had recently become eligible for employment by Federal Aviation Administration facilities, which in some instances offered better pay and benefits than those offered by Fort Rucker, a Department of Defense facility.

These considerations led to concern among Hinderliter and his supervisors that they could lose a substantial fraction of their air traffic controllers and be left short-staffed at any time, because the controllers were not required to provide advance notice before taking retirement, and hiring and training new personnel could be time-consuming. These concerns, then, were taken into account by Heisner and Phillips when they selected Nolan over the three plaintiffs for the vacancy at issue in this lawsuit.

The undisputed record demonstrates that someone, like Hinderliter and his supervisors, knowledgeable about the federal rules and regulations governing the retirement eligibility of air traffic controllers could examine a candidate's form SF 171 and, based upon the length and nature of their prior experience as controllers in the civil service, calculate with some degree of precision how much time remained before the candidate attained eligibility for the various retirement and early-retirement programs available to controllers at Fort Rucker. It is also beyond dispute that a comparison of Nolan's SF 171 with those of the plaintiffs would immediately reveal to a knowledgeable reader that the plaintiffs were far closer to retirement eligibility than Nolan was at the time he was selected for the vacancy at Fort Rucker.

Hinderliter, like the three panel members who testified at trial, also considered the relative cost of the candidates, in terms of their salaries under the pay-fixing policy, as well as personal recommendations, when he made the ultimate decision to select Nolan over the plaintiffs. Moreover, the record

shows that Hinderliter also considered the candidates' relative continuity, as measured by the time that remained before they became eligible for retirement under the governing federal statutes. In fact, Hinderliter had been concerned about the potential widespread retirement of his controller workforce for approximately two years prior to the selection of Nolan, and he had been instructed by the civilian personnel department at Fort Rucker to canvass his workforce to determine the number of controllers who were eligible to retire and may have planned to take early retirement. Hinderliter had created a wall chart specifically for purposes of keeping track of this information.

When Hinderliter was first given permission to fill the position eventually awarded to Nolan, he had the option of making it a GS–13, full performance (non-trainee) position, or of treating it as a GS–12 trainee slot. He opted for the latter, because he already had a sufficient number of full performance controllers, and intended to hire someone with less experience who could be trained for the position, again because of his concerns about the retirement-eligibility of a large proportion of his staff.

Nolan was qualified for the GS–12 trainee position. However, all three plaintiffs had significantly more overall experience as air traffic controllers than did Nolan. Additionally, Dilla and Lane had prior experience at airfields with complexity levels of IV or greater, while Nolan did not.[2] Also, there is no dispute that of the three plaintiffs Dilla was the most qualified for the position at issue in this suit.

2. Airfields are ranked as Level I through V in terms of the density of traffic and complexity of air traffic control operations, with Level I being the least dense and complex, and Level V being the most dense and complex. Fort Rucker's airfield is Level IV, and Fort Sill, the only base at which Nolan had worked as an air traffic controller, is Level III. Dilla and Lane, by contrast, had worked at Level IV airfields in the past. It is unclear whether Eason's prior experience as a controller included work at a Level IV or V facility.

3. Deposition of Robert P. Dilla, defendant's exhibit no. 12, at 94–95.

After the GS–12 trainee position at Fort Rucker had been advertised, but before the selection process had begun, Dilla traveled to Fort Rucker to meet with several controllers who worked at the facility. He also met with Hinderliter, although the latter was hesitant to discuss the vacancy with Dilla because he sought to avoid any appearance of impropriety, given that Hinderliter did not intend to interview any candidates for the position. During this meeting, Hinderliter made the following remark: "If it is up to me, I will not hire anyone for this position older than 30 or 35 years old."[3] Hinderliter made this statement in the context of a discussion about the status of Hinderliter's workforce and his concerns regarding the retirement-eligibility of many of his controllers.

There is evidence in the record indicating that Hinderliter told two of the air traffic controllers under his supervision that he hoped to hire a young controller to fill the GS–12 trainee position. Specifically, Hinderliter is alleged to have told air traffic controller Paul Steven Ferrell that "we really needed to get some younger blood into the facility,"[4] and air traffic controller Warner Phillip McElroy that "all of his problems would be solved or he wouldn't have a problem if he had, you know, a room full of younger people."[5]

There is also evidence in the record suggesting that two members of the panel that recommended the selection of Nolan over the plaintiffs, Heisner and Kenneth Bond, told air traffic controllers under their supervision at Fort Rucker that management intended to hire a younger candidate to fill the vacancy at issue in this lawsuit.[6]

4. See EEOC hearing transcript, defendant's exhibit no. 10, at 141–42 (testimony of Paul Steven Ferrell).

5. See Department of Defense, Office of Complaint/Investigations hearing transcript, defendant's exhibit no. 4, at 11 (testimony of Warner Phillip McElroy).

6. Heisner is alleged to have told Floyd Dean Fields, a controller at Fort Rucker, that "they would probably be looking for younger personnel to hire." Department of Defense, Office of Complaint/Investigations hearing transcript, defendant's exhibit no. 4, at 22 (testimony of Floyd

In August 1994, all three plaintiffs filed timely complaints with the Equal Employment Opportunity Commission (EEOC), alleging that they had been wrongfully denied the Fort Rucker position on the basis of their ages, and the United States Department of Defense, Office of Complaint Investigations (OCI) conducted a subsequent investigation. On the basis of this investigation, the OCI investigator recommended a finding of discrimination as to each plaintiff. In accordance with the investigator's recommendation, Fort Rucker determined that Dilla was the best qualified of the three plaintiffs, and offered him a GS–12 position with backpay.

Dilla rejected the offer, and instead requested, and received, a hearing before an EEOC administrative judge, who also recommended a finding of discrimination as to Dilla based upon the OCI investigator's report and the hearing transcript.

During the EEOC hearing, Hinderliter had testified that he was at his peak as an air traffic controller between the ages of 20 and 35 years.[7]

In the final agency decision, the director of the army's Equal Employment Opportunity Compliance and Complaints Review Agency rejected the administrative judge's recommendation and instead found that Dilla had not suffered from unlawful age discrimination. The director found, among other things, that the decision-maker was motivated by concerns about "the loss of staff through retirements," and the approximately $20,000 cost savings achieved by hiring Nolan over Dilla, due to Fort Rucker's pay-fixing policy.[8]

The plaintiffs subsequently filed the present lawsuit on March 7, 1997, and venue was transferred to this court on June 25, 1997.

## II. DISCUSSION

The plaintiffs have attempted to establish a prima-facie case of age discrimination by means of two of the methods available under the governing case law: (1) by presenting what they assert to be direct evidence of discrimination, and (2) by presenting circumstantial evidence in accordance with the test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burdens imposed on the parties differ depending on which method is employed. If the plaintiffs succeed in presenting direct evidence that a "discriminatory animus played a significant or substantial role in the employment decision, the burden shifts to the employer to show that the decision would have been the same absent discrimination." *Eskra v. Provident Life and Acc. Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir.1997). The rationale behind this burden shift is that "once a plaintiff produces direct evidence of a discriminatory motive, and the trier of facts accepts this testimony 'the ultimate issue of discrimination is proved' ... and 'the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account.'" (quoting *Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1556 (11th Cir.1983) and *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989)). If, however, no direct evidence

Dean Fields). Bond is alleged to have told Warner McElroy, another air traffic controller at Fort Rucker, that management sought "younger people." *Id.* at 7–8 (testimony of Warner Phillip McElroy).

7. The pertinent portion of Hinderliter's testimony reads as follows:

"Question: But in terms of directing air traffic, were you better at thirty-nine than you were at eighteen based on experience you've had?
"Hinderliter: Probably so. I was a trainee at eighteen.
"Question: You're good. It just occurred to me that you were an air traffic controller and you probably had some personal experience

based on your own history. But let me ask you after you became certified, when you were no longer a trainee, say at the age of twenty-five or twenty-six, did you feel that the experience between twenty-five and the age of forty gave you additional abilities that you didn't have when you were twenty-five?
"Hinderliter: I was at my peak between twenty and thirty-five.
"Question: You really believe that?
"Hinderliter: I know that."
EEOC hearing transcript, defendant's exhibit no. 10, at 110 (testimony of Dan R. Hinderliter).

8. *See* United States Department of the Army's final agency decision, defendant's exhibit no. 11, at 16, 20.

of discrimination is shown, and the plaintiffs must rely upon circumstantial evidence of age discrimination, they retain the ultimate burden of proving that they were victims of intentional discrimination. *See Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 963 (11th Cir.1997).

As explained below, even if the plaintiffs have succeeded in presenting direct evidence of discrimination, the court finds that they have not established liability under the ADEA, because the Secretary of the Army has shown by a preponderance of the evidence that there exists a legitimate, non-age-discriminatory motive for the hiring decision, and the decision would have been made even absent the impermissible age discrimination. Moreover, based upon its conclusion that the Army Secretary has succeeded in proving by a preponderance of the evidence that there was an independent, age-neutral reason for the selection of Nolan over the plaintiffs, the court also finds that the plaintiffs have failed to prove unlawful age discrimination based upon their proffered circumstantial evidence under the *McDonnell Douglas* framework.

A. Direct Evidence of Age Discrimination

The plaintiffs contend that they have presented direct evidence of age discrimination. Specifically, they assert that the following statements made by Hinderliter and others involved in the selection process constitute direct evidence: (1) Hinderliter's remark to Dilla, during his visit to Fort Rucker before the selection was made, that if it were up to Hinderliter, he would not hire anyone for the position who is older than 30 or 35 years; (2) Hinderliter's sworn testimony during the administrative proceedings in which he opined that he was at his peak as an air traffic controller when he was between 20 and 35 years of age; (3) statements allegedly made by Hinderliter to air traffic controllers at Fort Rucker during informal discussions, to the effect that he desired to bring "younger blood" into his staff; and (4) statements made by two members of the selection panel during informal interactions with air traffic controllers in which they noted that Fort Rucker sought to hire younger controllers. The court will examine each of these statements and testimony in turn to determine

whether they permit the plaintiffs to make out a prima-facie case of age discrimination based upon direct evidence.

■ At the outset, the court notes that discriminatory remarks by the decision-maker can of course constitute direct evidence of age discrimination. *See Zaben v. Air Products & Chemicals, Inc.,* 129 F.3d 1453, 1456 (11th Cir.1997). However, the plaintiffs cannot rely on remarks as direct evidence of discrimination unless they were uttered by the decision-maker in the challenged action himself, or, at the very least, by a person somehow involved in, or having an influence on, the decisional process. On this point, the case law is quite clear. *See Holifield v. Reno,* 115 F.3d 1555, 1563–64 (11th Cir.1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."); *Trotter v. Board of Trustees of Univ. of Ala.,* 91 F.3d 1449, 1453–54 (11th Cir.1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged action."); *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("stray remarks in the workplace ..., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination).

Thus, the plaintiffs may enlist the comments of individuals at Fort Rucker in their effort to establish discrimination on the basis of direct evidence only to the extent that the comments were uttered by those who were somehow involved in the decision to select Nolan over the plaintiffs for the air traffic controller position.

Also, the court notes that the determination of whether the plaintiffs have established age discrimination by direct evidence is somewhat complicated by the fact that the definition of what constitutes direct evidence of discrimination is subject to frequent shifts, even among different panels of the Eleventh Circuit Court of Appeals. For instance, in *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990), the court applied a relatively

broad definition, explaining that "direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." However, more recent Eleventh Circuit decisions have adopted a considerably narrower definition of direct evidence. For instance, in *Clark v. Coats and Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir.1993), the court stated that direct evidence of employment discrimination is evidence that "is sufficient to prove discrimination without inference or presumption. Only the most blatant remarks, whose intent could be nothing other than to discriminate, constitute direct evidence." (citations omitted). *See also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641–42 (11th Cir.1998).

Nevertheless, it is unclear what the Eleventh Circuit meant by its narrower definition that direct evidence is "evidence sufficient to prove discrimination without inference or presumption." *Clark*, 990 F.2d at 1223.

Does the definition mean that the evidence is sufficient if it reflects, without inference or presumption, a mere discriminatory bias toward the group to which the employee belongs, in other words, that the evidence need only reflect a general discriminatory bias? Or does the direct evidence definition require more, that is, that the evidence must reflect, without inference or presumption, a specific discriminatory intent to commit the challenged conduct? In *Haynes v. W.C. Caye & Company, Inc.*, the Eleventh Circuit implied the former, giving as an example of direct evidence of a gender-based demotion or discharge, a supervisor's question whether "a sweet little old lady could get tough enough with the customers and collect the money." 52 F.3d 928, 930 (11th Cir.1995). However, in *Castle v. Sangamo Weston, Inc.*, the court appeared to apply the latter definition, giving as an example of direct evidence of age discrimination, a scrap of paper reading, "Fire Rollins—she is too old." 837 F.2d 1550, 1558 n. 13 (11th Cir.1988).[9]

9. In *Hearn v. General Electric Co.*, 927 F.Supp. 1486, 1497–98 (M.D.Ala.1996) (Thompson, J.), this court expounded at length on the murkiness of the Eleventh Circuit's direct evidence definition and, in addition, on the needlessness and implausibility of the distinction between direct and circumstantial evidence:

"Moreover, this court is not sure that an endeavor to resolve what the Eleventh Circuit meant by its definition would be fruitful. Determining whether a specific piece of evidence constitutes 'direct evidence' would necessarily be an imprecise effort. This is so because, in the end, 'direct evidence' is really in the eye of the beholder. A recent commentator described the efforts by the Courts of Appeals to define direct evidence as 'a semantic haze.' Robert Brookins, Mixed–Motives, Title VII, and Removing Sexism from Employment: The Reality and the Rhetoric, 59 Alb. L.Rev. 1, 86 (1995).

"This court also questions the reasons behind drawing any distinction between direct and circumstantial evidence in the context of discrimination law. In most, if not all, other areas of the law, the two are treated as comparable. In *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954), the Supreme Court wrote, with regard to criminal law, that, 'Circumstantial evidence ... is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the

evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities.' Similarly, in *United States v. Wolfe*, 611 F.2d 1152, 1155 (1980), the former Fifth Circuit wrote that, 'As a general rule the law makes no distinction between direct and circumstantial evidence, but simply requires before convicting a defendant you, the jury, be satisfied of the defendant's guilt beyond a reasonable doubt from the evidence in the case.' And in *United States v. Rackley*, 742 F.2d 1266, 1273–1274 (1984), the Eleventh Circuit wrote that, 'The law recognizes both direct and circumstantial evidence, and ... it makes no distinction as to the weight to be given either.'

"This refusal to distinguish the types of evidence generally applies in the civil context as well. The pattern instruction for civil jury cases, as given in E.J. Devitt, et al., Federal Jury Practice and Instructions: Civil, § 72.03 (1987), is as follows: 'As a general rule, the law makes no distinction between direct or circumstantial evidence, but simply requires that the jury find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial.'

"In view of the refusal of courts, as a general proposition, to draw a distinction between direct and circumstantial evidence, this court sees no reason to single out discrimination law for different treatment. The Supreme Court's admonition in *Holland*—'circumstantial evidence may in some cases point to a wholly

The court will proceed on the basis of the more constricted definition of direct evidence, as employed in the most recent decisions of the Eleventh Circuit, and find that the plaintiffs have proffered direct evidence of age discrimination only if the statements at issue are sufficient, without inference or presumption, to prove discriminatory intent to commit the challenged act. Under this standard, the court concludes that the plaintiffs cannot establish discrimination by way of direct evidence on the basis of the remarks made by Hinderliter and members of the selection panel, for the following reasons.

Regarding the first statement attributed to Hinderliter, that he would prefer to hire a 30- to 35-year-old for the position, the court does find, despite the Army Secretary's arguments to the contrary, that Hinderliter made this remark when he first met Dilla at Fort Rucker, after the job vacancy was announced but before Dilla applied for the position. However, the court does not agree with the plaintiffs that the statement provides direct evidence that Hinderliter impermissibly based his decision to hire Nolan on the fact that Nolan satisfied Hinderliter's predetermined age qualifications. While the court finds that this statement supports a reasonable inference that the plaintiffs' ages—and associated stereotypical thinking regarding older employees, namely that they are more likely to retire in the near future—influenced Hinderliter's decision to select a younger man for the vacancy, the fact that such a conclusion depends upon the drawing of inferences from Hinderliter's statement undermines any attempt to characterize the statement as direct evidence. When properly viewed in the context in which it was uttered, specifically a conversation about the potential imminent retirement of a large percentage of Hinderliter's workforce, this statement is susceptible to differing interpretations: Hinderliter may have been expressing his desire to offer the position to younger candidates because they would be likely to retire quickly and thus potentially leave him short-staffed at an inconvenient time, or he may merely have been expressing his desire to hire someone with less civil service experience who would be statutorily-ineligible to retire for a long period of time, and who would therefore offer the high degree of 'continuity' he sought in a candidate.[10] Because it finds that the statement is subject to either of these interpretations, the latter of which is untainted by unlawful age bias, the court cannot conclude that the statement constitutes direct evidence of age discrimination.

Turning next to Hinderliter's testimony during the administrative hearing to the effect that he was at his peak as an air traffic controller between the ages of 20 and 35,[11] the court finds, once again, that while this testimony does provide a whiff of arguably stereotypical thinking about age on Hinderliter's part, it is only on the basis of an inference or series of inferences that one may conclude that Hinderliter was articulating a stereotypical view that competence or productivity as an air traffic controller is age-dependent. As the Army Secretary convincingly argues, Hinderliter gave his testimony in response to a question concerning his own experience as an air traffic controller, and that experience was limited to the time he was between 20 and 35 years of age, because he became a supervisor after that period of time. Moreover, even absent this undisputed fact, the court observes that to detect the odor of age discrimination in this testimony one must infer from Hinderliter's description of his own, unique experience as an air traffic controller that he harbored the same attitude toward all other controllers, and that such

incorrect result,' but 'this is equally true of testimonial evidence,' 348 U.S. at 139–40, 75 S.Ct. at 137–138—applies equally to discrimination law. Indeed, if a distinction needed to drawn anywhere, it would be in the criminal context since the burden of proof there is the highest."

10. As explained in more detail below, when the court examines the Supreme Court's decision in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), consideration of a job candidate's retirement eligibility is permissible and does not constitute unlawful age discrimination unless accompanied by a reliance upon inaccurate and denigrating age-based stereotypes.

11. The pertinent portion of Hinderliter's testimony is set forth above. *See supra* note 5.

age-biased thinking influenced the decision-making process. Thus, like the remark Hinderliter made to Dilla regarding his hiring preferences, Hinderliter's testimony during the administrative proceedings does not satisfy the Eleventh Circuit's current definition of direct evidence of discrimination.

 Regarding the statements that Hinderliter allegedly made to members of his workforce that he sought to bring "younger blood" into Fort Rucker, the court is not convinced that Hinderliter actually made these statements.[12] However, even if it assumes for the sake of argument that Hinderliter did, as the plaintiffs contend, make such remarks to controllers under his supervision, the court cannot conclude that such remarks would satisfy the definition of direct evidence discussed above. Once again, the context of these remarks, if they may in fact be attributed to Hinderliter, is clear: both air traffic controllers who testified to having heard the comments indicated that they were made in the context of discussions regarding the large number of controllers in Hinderliter's workforce who were, or who would soon be, eligible for retirement.[13] Thus, while these remarks, if made, could support an inference that Hinderliter impermissibly relied upon stereotypical assumptions regarding the relationship between age and the likelihood of retirement, these remarks are likewise consistent with the Army Secretary's position that Hinderliter simply sought a controller whose relative inexperience, or 'junior' sta-

tus, made it impossible for him or her to be eligible for retirement in the near term.

 Finally, for the same reasons the court also finds that the statements attributed to two members of the panel that selected Nolan over the plaintiffs, Kenneth Bond and Thomas Heisner, even if they were indeed made by these individuals, do not constitute direct evidence of discrimination. As previously stated, Bond is alleged to have told Warner McElroy, an air traffic controller at Fort Rucker at the time Nolan was selected for the vacancy, that management sought younger controllers, while Heisner is alleged to have told Floyd Dean Fields, another controller at Fort Rucker, that they would probably be looking for younger personnel to hire. Although the court recognizes that Bond and Heisner were involved in the decision-making process that led to the selection of Nolan over the plaintiffs, the uncontradicted record establishes that each alleged statement was made in the context of discussions regarding Fort Rucker's concern about the potential widespread retirement of its controllers.[14] Consequently, like the remarks and testimony of Hinderliter's discussed above, these statements cannot be said to constitute direct evidence of age discrimination because they are susceptible to multiple interpretations, including one that does not evince unlawful age discrimination.

 For the foregoing reasons, the court finds that the plaintiffs have failed to establish a prima-facie case of discrimination on

---

12. As previously stated, the plaintiffs cite alleged remarks made by Hinderliter to air traffic controller Paul Steven Ferrell, to the effect that "we really needed to get some younger blood into the facility," see EEOC hearing transcript, defendant's exhibit no. 10, at 141–42 (testimony of Paul Steven Ferrell), and alleged remarks Hinderliter made to air traffic controller Warner Phillip McElroy, that "all of his problems would be solved or he wouldn't have a problem if he had, you know, a room full of younger people." See Department of Defense, Office of Complaint/Investigations hearing transcript, defendant's exhibit no. 4, at 11 (testimony of Warner Phillip McElroy).

13. See EEOC hearing transcript, defendant's exhibit no. 10, at 142–43 (testimony of Paul Steven Ferrell) (testimony by Ferrell that Hinderliter's alleged remarks did not reflect age-discriminatory animus, but related instead to retirement-eligi-

bility concerns); Department of Defense, Office of Complaint/Investigations hearing transcript, defendant's exhibit no. 4, at 11–12 (testimony of Warner Phillip McElroy) (indicating that concerns about retirement-eligibility prompted the alleged remark).

14. For instance, Fields further described the context of Heisner's alleged statement as follows: "The feeling was that the work force was getting older and I guess they were concerned about too many people retiring at once . . . . we are an older work force and there are quite a few fellows who are eligible for retirement at, say, one particular time. You know, a number of people could retire at once, which would leave the facility short." Department of Defense, Office of Complaint/Investigations hearing transcript, defendant's exhibit no. 4, at 22–23 (testimony of Floyd Dean Fields).

the basis of direct evidence. However, the court emphasizes that the plaintiffs would have been unable to establish the Army Secretary's liability under the ADEA even if the court found that the statements and testimony by Hinderliter and the members of the selection panel did constitute direct evidence. This is the case because the Army Secretary would have readily satisfied his burden of proving by a preponderance of the evidence that the identical decision would have been made even if the stereotypical assumptions regarding older employees' likelihood of retiring had not been taken into account.

Specifically, the court observes that the record is replete with credible evidence that Hinderliter and at least two of the panel members based their decision upon an assessment of the years remaining before each candidate became eligible for retirement, a figure that was readily estimated upon examination of the candidates' applications, without reference to the candidates' ages.[15] As previously explained, ample credible evidence exists in the record before the court to support a finding that Hinderliter was responding to concerns about the large percentage of Fort Rucker's air traffic controllers who were eligible or would soon be eligible for retirement when he hired Nolan. The record indicates that Hinderliter feared that he could soon lose 14 or more of his 34 air traffic controllers to early retirement, and that about half of the workforce in his division was or would soon be eligible to retire. In fact, the record establishes that Hinderliter had formulated a plan to 'over hire' younger air traffic controller trainees at a low grade in preparation for an anticipated critical shortage of controllers. Thus, the court finds that Nolan would have been hired because he was significantly further from retirement eligibility than were the three plaintiffs, in view of the potentially widespread retirement of personnel within Fort Rucker's air traffic controller ranks, even if stereotypical assumptions about older workers' retire-

ment plans had not been impermissibly taken into account.

However, under the federal statute that governs retirement eligibility of air traffic controllers, such eligibility is directly correlated to, and inseparable from, the controller's age. As stated, controllers who have worked for 25 years may retire at any age, and those who have worked for 20 years may retire at age 50. *See* 5 U.S.C.A. § 8336(e). The difficult legal question for the court, then, is whether consideration of the candidates' retirement-eligibility status under these circumstances constitutes age discrimination under the ADEA, because one cannot consider that status without taking into account the candidates' ages.

Guidance in resolving this issue is provided by the Supreme Court's decision in *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), where the Court was confronted with the question of whether termination of an employee shortly before his pension vested as a cost-savings measure is proscribed by the ADEA. Although it agreed that pension vesting and age are closely correlated, the Court explained that the accrual of pension benefits actually depends upon years of service, and because the plan had only a short, ten-year, vesting period and thus age and years of service were "analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Hazen Paper,* 507 U.S. at 611, 113 S.Ct. at 1706–07. The Court emphasized that the sine qua non of a claim for age discrimination under the ADEA is that the employer unlawfully relied upon "inaccurate and stigmatizing stereotypes" in carrying out the challenged employment action, and that this problem disappears when the employer is wholly motivated by factors other than age, including financial considerations that may have some relationship to the employee's age. *Id.* Thus, actionable age

---

15. As previously explained, the record before the court establishes that Hinderliter and his supervisors could examine candidates' form SF 171 and, based upon the length and nature of their prior experience, estimate with some precision how much time remained before the candidates

attained retirement eligibility, and that a comparison of Nolan's SF 171 with those of the plaintiffs would show that the plaintiffs were far closer to retirement eligibility than Nolan was at the time he was selected for the vacancy at Fort Rucker.

discrimination may be found when the employer "targets employees with a particular pensions status on the assumption that these employees are likely to be older," but not where it is the pension status alone, with its attendant financial consequences, that was the employer's sole focus. *Id.* at 612–13, 113 S.Ct. at 1707.

*Hazen Paper* specifically addressed the legitimacy of employers' concerns about the costs associated, but not directly correlated, with older employees. Emphasizing that the vesting period for the pension plan was very short, just ten years, the Supreme Court explained:

> "An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, *see* 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"

507 U.S. at 611, 113 S.Ct. at 1707. As explained above, here, by contrast, reliance was made upon the retirement eligibility of prospective employees, which, unlike the financial considerations addressed in *Hazen Paper*, is directly correlated with and inseparable from age, because Fort Rucker's air traffic controllers become eligible for retirement with full benefits based in part upon their age—that is, the applicable rules expressly provide that those who have worked for 20 years may retire at *age 50.* Here, both years of service *and* age are factors expressly to be considered. Thus, the question arises whether the holding in *Hazen Paper* may be extended to the instant lawsuit, where age and retirement status are inextricably linked, and where hiring decisions are predicated upon candidates' retirement eligibility, such that those who are ineligible to retire for many years are more favorably considered.

As previously noted, the *Hazen Paper* Court expressly left open the possibility that age discrimination may be established where an employer "targets employees with a particular pension status on the assumption that these employees are likely to be older." 507 U.S. at 612–13, 113 S.Ct. at 1707. The discrimination under such circumstances arises because pension status serves as a "proxy for age, not in the sense that the ADEA makes the two factors equivalent, but in the sense that the employer may suppose a correlation between the two factors and thus act accordingly." *Id.* While this portion of *Hazen Paper* may be interpreted to suggest that age discrimination should be found where an employer bases an adverse employment decision on an individual's retirement or pension status under circumstances in which there is a perfect correlation between that status and the individual's age, the *Hazen Paper* Court expressly disavowed such an extension of its holding, stating that "we do not consider the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service, ... and the employer fires the employee in order to prevent vesting." 507 U.S. at 613, 113 S.Ct. at 1707 (citation omitted). This court instead concludes that the above passage must be read in the context of *Hazen Paper*'s broader principle that age discrimination occurs only when "the problem of inaccurate and stigmatizing stereotypes" about older workers are operative. 507 U.S. at 611–612, 113 S.Ct. at 1706–07; *see id.* at 611, 113 S.Ct. at 1706 ("It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age."). When read in this light, the aforementioned passage establishes only that discrimination under the ADEA may be shown by demonstrating that the employer's professed reliance upon retirement or pension status was intended to conceal the fact that the decision was actually based upon prohibited stereotypes regarding the employees' ages. That is, the employer must have exploited the perfect or near-perfect correlation between retirement or pension status and age to mask his true reliance on age and age-based stereotypical thinking.

■ Thus, this court concludes that the mere fact that there exists a perfect correla-

tion, or even a direct link, between age and the factor purportedly relied upon by the employer does not perforce mean that the employer has impermissibly relied on age. This conclusion is consistent with the decisions of other courts that have addressed whether age discrimination is established where adverse employment actions are based upon the perfectly age-correlated retirement status of individuals. For instance, in *Sperling v. Hoffmann–La Roche, Inc.,* 924 F.Supp. 1346, 1383–84 (D.N.J.1996), the district court held that a company's reliance upon the fact that an employee had "ample retirement benefits" in firing the employee does not violate the ADEA, despite the fact that the definition of "ample retirement benefits" mandated that the employee be at least 50 years old. Absent evidence that the employer's firing decision was motivated by the inaccurate and denigrating stereotypes that the Supreme Court decried in *Hazen Paper,* the *Sperling* court held, no cause of action for age discrimination may be made out, even though the relied upon status was perfectly correlated with age. 924 F.Supp. at 1398. *See also Geiger v. AT & T Corp.,* 962 F.Supp. 637, 643–44 (E.D.Pa.1997) (finding absence of direct evidence of age discrimination where plaintiff did not show that the employer "used the correlation between retirement status and age as a shield to terminate retirees' contracts because of their age," despite the fact that one could not qualify for retirement without falling within the protected age class).[16]

Here, as stated, the Secretary of the Army has proffered sufficient evidence to support the conclusion that Hinderliter and the panel-members focused on the candidates' retirement-eligibility status as determined without reliance upon their ages or age-biased assumptions regarding older employees' propensity to retire earlier. As a result, there is ample credible evidence to conclude, and this court so finds, that the decision to hire Nolan over the plaintiffs would have been reached

even absent reliance upon the "inaccurate and stigmatizing" age-based stereotypes decried in *Hazen Paper. See* 507 U.S. at 612, 113 S.Ct. at 1707 (describing the prohibited stereotype as follows: "Older employees are likely to be ___"). That is, the same decision would have been reached upon consideration of Nolan's statutorily-defined retirement eligibility, as determined on the combined basis of his relatively limited work experience in the federal civil service and his age, rather than on the basis of a generalized and impermissible assumption that older employees are likely to retire earlier. Thus, the court concludes that, under *Hazen Paper,* Hinderliter and the selection panel would have chosen Nolan over the plaintiffs based upon a legitimate, age-neutral consideration, and therefore the plaintiffs would have failed to establish liability even if they had succeeded in demonstrating age discrimination based upon direct evidence.

■ Moreover, the court concludes on the basis of the record before it that the decision to hire Nolan most likely would have been made, even absent improper reliance upon age, on the basis of the desire to control costs by hiring a less-experienced controller who would command a lower salary than the more-experienced plaintiffs. Uncontradicted evidence establishes that at the time Nolan was selected for the air traffic controller position Fort Rucker had in place a so-called 'pay fixing' policy, which, as explained above, adjusts an employee's salary upward in recognition of a previously-held higher governmental grade of employment. The record also shows that all three plaintiffs, prior to the time that they applied for the position at Fort Rucker, had held air traffic controller positions at a substantially higher grade than those associated with any of Nolan's previous positions, and therefore that they would have been paid at a significantly higher salary than Nolan for performing the same job at Fort Rucker. For instance, it is undisputed that once certified as a full performance con-

---

**16.** The difficulty that this and other courts have faced in ascertaining whether employers may lawfully base employment decisions upon a factor that is inextricably linked to age, such as retirement-eligibility status, counsels clarification by Congress regarding whether the ADEA pro-

scribes employers' consideration of such a factor. This court has a great deal of sympathy for lawyers who have struggled to make sense of this remarkably unclear and vexing area of anti-discrimination law.

troller at Fort Rucker, Dilla would have commanded a salary that exceeded Nolan's by approximately $20,000 per year, while performing the same job duties.[17]

The record also contains undisputed evidence that Hinderliter, as commander of Fort Rucker's air traffic control facility, was subject to pressure from his superiors to achieve cost reductions in his operations. The court credits Hinderliter's testimony that in view of this pressure he sought to hire an air traffic controller who was qualified for the position but whose previous experience would not qualify him for a relatively high salary under the pay-fixing policy.[18] Thus, the court concludes that Hinderliter would have hired Nolan even if he had not taken the candidates' ages into account on the basis of the cost savings that he could achieve by hiring Nolan over the costlier, in terms of salary, plaintiffs.

As explained above, in *Hazen Paper* the Supreme Court made it clear that the desire to control costs by hiring less-experienced personnel who would command a lower salary than more-experienced candidates may be deemed a legitimate, non-age-discriminatory consideration under the ADEA, even if age and salary are correlated. *See Schiltz v. Burlington Northern Railroad,* 115 F.3d 1407, 1411–12 (8th Cir.1997) (use of salary and grade level as factors in hiring decision do not establish age discrimination in view of *Hazen Paper*); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152 (5th Cir.1995) (even if employee could establish that discharge decision was motivated by employee's high salary or imminent eligibility for retire-

ment benefits, no basis for age discrimination would exist because "the ADEA prohibits discrimination on the basis of age, not salary or seniority"); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1125 (7th Cir.1994) (citing *Hazen Paper,* court rejects plaintiff's argument that employer committed age discrimination by firing him simply to reduce its salary costs). Thus, in view of the foregoing authorities, the court's conclusion that the plaintiffs have not established liability under the ADEA, even if the evidence that existed to demonstrate that stereotypical thinking regarding older employees' retirement plans had tainted the selection process could be considered direct, is reinforced by the finding that Hinderliter would have selected Nolan over the plaintiffs based upon cost-reduction considerations.

The court also notes that the plaintiffs have proffered evidence, in addition to the statements and testimony by Hinderliter and members of the selection discussed at length above, in an attempt to persuade the court that Hinderliter's and the selection panel's professed reliance upon the candidates' retirement status and the financial considerations raised by Fort Rucker's pay-fixing policy is unworthy of credence and a mere pretext masking unlawful age discrimination.[19] Specifically, they point to evidence indicating that (1) Hinderliter was developing a plan that would limit hiring for certain positions to individuals under 31 years of age, (2) Hinderliter and the selection panel failed to interview any of the candidates for the GS–12 trainee position, (3) all three plaintiffs were better qualified than Nolan for the posi-

---

**17.** The evidence before the court indicates that Dilla's highest previously-held grade as an air traffic controller was GS–14, step 5, Lane's was GS–13, step 4, and Eason's was GS–13, step 3. By contrast, Nolan's highest previously-held grade was GS–12, step 1. Consequently, all three plaintiffs would have benefitted from Fort Rucker's pay-fixing policy because their salaries would have reflected the higher grades that they had previously attained in the civil service, despite the GS–12–trainee nature of the position at issue in this lawsuit, while Nolan would not have so benefitted, because he was hired at the highest level he had attained by that time.

**18.** Hinderliter has consistently summarized his objective as finding "the best product for the best

price." *See, e.g.,* EEOC hearing transcript, defendant's exhibit no. 10, at 73 (Testimony of Dan R. Hinderliter)

**19.** The question of pretext arises, typically, where the plaintiff relies upon circumstantial evidence of discrimination. Nonetheless, the court discusses pretext here because, although the previous discussion has focused on whether the plaintiffs have established liability on the basis of direct evidence of discrimination, the plaintiffs' pretext argument also constitutes a challenge to the Army Secretary's contention that the decision to hire Nolan would have been made even absent consideration of the candidates' ages, in light of the retirement-eligibility and financial concerns that motivated the decision.

tion, (4) cost was not a factor in Hinderliter's decision, because he had already achieved substantial cost savings by converting two originally higher-grade positions into the single GS–12 position for which Nolan had been hired, and (5) there is a significant pool of qualified applicants for any vacant positions arising upon retirement of current controllers, so that retirement-eligibility concerns are unfounded and pretextual.[20]

■ The court concludes that this evidence casts no doubt upon its finding that the decision to select Nolan over the plaintiffs would have been made even absent the impermissible consideration of the candidates' ages. With respect to Hinderliter's efforts to establish a program of hiring controllers under 31 years of age, it is clear from the undisputed record that this program, which was undertaken to recruit a number of younger controllers as "over hires," unquestionably reflected Hinderliter's desire to "shore the defenses of retirement eligibles," [21] and was not based upon impermissible considerations of age. Uncontradicted testimony by Hinderliter indicates that the federal guidelines under which this program was pursued did not permit Hinderliter to employ a person over the age of 31, and these individuals were hired at a GS level far below that of the position at issue in this lawsuit. Thus, the evidence concerning Hinderliter's over-hire program does not disturb the court's conclusion that Nolan would have been hired for the GS–12-trainee position even absent impermissible considerations of age.

Likewise, the record establishes that Hinderliter's decision not to interview any candidates for the vacancy was made for reasons of cost and efficiency, and that the application materials that Hinderliter and the selection committee had in hand contained ample information, including previous job evaluations and recommendations from prior supervisors, to enable them to make an informed

choice without formally interviewing the candidates. On this record, the court finds that it would be unreasonable to draw the inference, as the plaintiffs apparently urge, that Hinderliter and the panel did not hold formal interviews because their decision was based exclusively on the candidates' ages, which could be gleaned from the application documents themselves.

■ Neither is the court swayed by the proffered evidence that the plaintiffs were better qualified for the Fort Rucker position than Nolan. Even if such evidence is fully credited, and this court were to find that Nolan lacked the experience and skills that the plaintiffs had attained over their lengthier careers as air traffic controllers, such a finding would not undermine the court's conclusion that concerns about both the potential retirement of a large percentage of his controllers and the high cost of more-experienced controllers under the pay-fixing policy would have led Hinderliter to hire Nolan over the plaintiffs. First, the court has found, and the plaintiffs do not dispute, that Nolan was indeed qualified for the position at issue. Second, the court concludes that the retirement-eligibility and cost-savings concerns were so strong that they would have prevailed over any differences in Nolan's and the plaintiffs' relative qualifications. That is, the court is convinced by the record before it that even in the face of the plaintiffs' more extensive experience at high-complexity airfields Hinderliter believed that any additional training time required to bring Nolan up to the requisite level of competence would be outweighed by Nolan's substantially lower salary and the fact that he would offer greater 'continuity' because he would be statutorily-ineligible to retire for a significantly greater number of years than would the plaintiffs. Finally, as the Secretary of the Army has properly observed, the ADEA does not authorize the court to interfere with employers' decisions regarding which of several qualified candidates should be hired, in the absence of

---

**20.** The plaintiffs also state that Hinderliter told Eason before he hired Nolan that other jobs at Fort Rucker may become available in the future if Eason were to be passed over. *See* EEOC hearing transcript, defendant's exhibit no. 10, at 47–48 (testimony of Dennis J. Eason). However,

the relevance of this remark to the question of whether Hinderliter discriminated against the plaintiffs on the basis of their ages eludes the court.

**21.** *Id.* at 80–82 (testimony of Dan R. Hinderliter).

evidence that unlawful considerations of age tainted the selection process. *See Dupre v. Fru–Con Eng'g Inc.*, 112 F.3d 329, 335–36 (8th Cir.1997) (noting that the ADEA does "not require that an employer retain those employees whom the Court or the jury consider most qualified for the job," but "only that the employer's decision not be based on age. When an employer decides to discharge one employee and not to discharge another and his determination is reasonably attributable to an honest and non-discriminatory, though partially subjective, evaluation of the employee's qualifications, no inference of a violation of the [ADEA] can be drawn."); *cf. McCarthney v. Griffin–Spalding County Bd. of Educ.*, 791 F.2d 1549, 1551 (11th Cir.1986) ("Title VII does not require an employer to hire or promote the most qualified applicant.").

Turning to the plaintiffs' argument that cost was not truly a factor in the decision to hire Nolan because Hinderliter had already achieved substantial savings by downgrading the available position to a GS–12 and creating, in effect, a single GS–12 positions from a GS–15 and a GS–13 position,[22] the court concludes that this argument defies logic. As the Army Secretary correctly observes, the fact that Hinderliter had already reduced his salary costs by eliminating a position and downgrading a second position does not detract from the fact that by hiring Nolan instead of one of the plaintiffs for the newly-created position Hinderliter could achieve still greater cost savings, in view of Fort Rucker's pay-fixing policy, which, as the plaintiffs do not dispute, recognizes employees' highest previously held grade. Thus, in no way do the plaintiffs call into question the Army Secretary's contention, which finds ample support in the record, that the hiring of Nolan over one of the plaintiffs saved Fort Rucker several thousand dollars per year in salary costs. Because, as the undisputed

record also establishes, Hinderliter was facing significant budgetary constraints, and he was able to avail himself of the opportunity to achieve a reduction in costs by hiring a candidate whose previous experience was limited to lower-grade positions, it can hardly be said that cost considerations alone would not have motivated Hinderliter's decision to hire Nolan, even absent consideration of the candidates' ages.

Finally, the plaintiffs' proffered evidence regarding the existence of a significant pool of qualified applicants for any vacant positions that would arise upon retirement of current controllers also does nothing to undermine the court's conclusion. The plaintiffs cite the fact that 16 qualified candidates applied for the position eventually filled by Nolan.[23] However, they ignore the fact that Hinderliter's concern about widespread retirement was not based upon the possibility that he would be unable to *find and recruit* new controllers to fill the newly-vacated positions, but rather that the retirements could seriously disrupt his operations both because budgetary constraints were such that certain positions would be permanently eliminated upon vacancy, and because his staff could be reduced to a "critical level" if he lost several controllers to retirement at the same time.[24] In addition, the record suggests that there may be delays in hiring replacement controllers and bringing them up to speed.[25] The plaintiffs have proffered no evidence to indicate that these concerns are hypothetical or unworthy of credence.

For the foregoing reasons, the court concludes that the plaintiffs could not establish that the Army Secretary is liable for age discrimination under the ADEA, even if they had succeeded in proffering direct evidence of such discrimination, because the Army Secretary has proven by a preponderance of

---

**22.** Plaintiffs' motion for summary judgment, filed on February 2, 1998, at 12; *see also* plaintiffs' response to defendant's motion to dismiss, or in the alternative, for summary judgment, filed on February 24, 1998, at 3.

**23.** *See* plaintiffs' response to defendant's motion to dismiss, or in the alternative, for summary judgment, filed on February 24, 1998, at 2–3.

**24.** *See* OCI hearing transcript, defendant's exhibit no. 4, at 83 (testimony of Dan R. Hinderliter); *see also id.* at 285–86, 289–90 (testimony of John Wilder).

**25.** *See* defendant's reply in support of motion for summary judgment, filed on March 10, 1998, at 8–9.

the evidence that the decision to hire Nolan over the plaintiffs would have been made even absent the discriminatory motive. *See Eskra v. Provident Life and Acc. Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir.1997). In other words, the Army Secretary has shown, as he must to evade liability, that there was an independent, age-neutral reason for his failure to hire one of the plaintiffs.·

### B. Circumstantial Evidence of Age Discrimination

As previously stated, in addition to their attempt to prove discrimination on the basis of direct evidence, the plaintiffs have also relied upon circumstantial evidence under the test set forth in *McDonnell Douglas.* That test requires each plaintiff to establish a prima-facie case by showing that (1) he is member of a protected class, (2) he applied for and was qualified for the Fort Rucker air traffic controller position, (3) despite his qualifications, he was rejected, and (4) the position was filled by a younger person. *See Eskra,* 125 F.3d at 1411; *see also O'Connor v. Consolidated Coin Caterers, Corp.,* 517 U.S. 308, 312, 116·S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (eliminating requirement that ADEA plaintiff must have been replaced by someone outside of the protected class). The Army Secretary does not dispute that the plaintiffs have satisfied all elements of the prima-facie case. He contends, however, that the decision to hire Nolan was motivated by legitimate, non-age-discriminatory considerations, including the retirement-eligibility and cost-savings concerns discussed at length above.

■ Because the court has concluded that the decision to select Nolan based upon these two concerns would have overcome even ·proof of discrimination by direct evidence, where the defendant has the burden of persuasion, in light of the finding that the decision to hire Nolan would have been made absent unlawful consideration of the candidates' ages, there is no need for the court to address in detail whether the plaintiffs have succeeded in establishing liability by circumstantial evidence, where the burden of proving discrimination is retained by the plaintiffs. Simply stated, the evidence discussed above that persuaded the court that Hinderli-

ter had a legitimate, age-neutral reason that would have led him to select Nolan .over the plaintiffs absent consideration of age also convinces the court that the plaintiffs cannot prove, as they must, that the Secretary of the Army's proffered reasons for the employment decision are pretexts for discrimination. The evidence that the plaintiffs point to in support of their contention that the retirement-eligibility and cost-savings explanations are unworthy of credence and that Hinderli-. ter was instead motivated by a discriminatory motive is essentially identical to that discussed above in the direct-evidence context, and, as explained above, this evidence does not undermine the credibility of the two non-age-discriminatory reasons articulated by the Army Secretary for the decision to hire Nolan.

Consequently, the court concludes that· the plaintiffs have failed to establish that the Secretary of the Army is liable for age discrimination under the ADEA on the basis of circumstantial evidence, because they have not succeeded in demonstrating that the non-age-discriminatory reasons for the selection of Nolan over the plaintiffs are merely pretexts masking unlawful discrimination.

### III. CONCLUSION

The court would emphasize that, when confronted with the application of workplace rules that expressly implicate age (as was true in this case because an employee with 20 years could retire at 50), employers must be careful that the true target of their concern is the non-age factor (in this case, retirement eligibility). Here, because the plaintiffs have failed to establish, by either direct or circumstantial evidence, that the decision to hire Nolan instead of one of the plaintiffs for the air traffic controller position at issue in this lawsuit constituted age discrimination under the ADEA, the court finds in favor of the Army Secretary and against the plaintiffs.

An appropriate judgment will be entered in favor of the Secretary of the Army.